**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| **STEVE BECKETT**,<br>individually and on behalf of<br>all others similarly situated,<br>c/o DannLaw<br>15000 Madison Avenue<br>Lakewood, OH 44107<br>　　　　　　　Plaintiffs,<br><br>v.<br><br>**BITCOIN DEPOT, INC.**<br>c/o Corporation Service<br>Company Registered Agent<br>135 North Pennsylvania<br>Street, Suite 1610<br>Indianapolis, IN 46204<br>AND<br>**BITCOIN DEPOT<br>OPERATING, LLC (D/B/A<br>BITCOIN DEPOT)**<br>c/o Corporation Service<br>Company Registered Agent<br>135 North Pennsylvania<br>Street, Suite 1610<br>Indianapolis, IN 46204<br>　　　　　　　Defendants. | **Case No. 1:25-cv-01450-TWP-MG**<br><br>Judge Tanya Walton Pratt<br>Magistrate Judge Mario Garcia |

<u>**DEFENDANTS BITCOIN DEPOT INC. AND BITCOIN DEPOT OPERATING, LLC
(D/B/A BITCOIN DEPOT)'S MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION TO COMPEL ARBITRATION AND STAY OR
DISMISS THE ACTION OR IN THE ALTERNATIVE TO DISMISS AND STRIKE
CLASS ALLEGATIONS**</u>

　　　Bitcoin Depot Inc., and Bitcoin Depot Operating, LLC (d/b/a Bitcoin Depot) (collectively

"Defendants")[1] hereby respectfully move, pursuant to the Federal Arbitration Act ("FAA"), 9

U.S.C. § 1 *et seq.*, and Rules 12(b)(6), 12(f), and 23 of the Federal Rules of Civil Procedure, for

---

[1] Bitcoin Depot Inc. does not own or operate ATMs and had no interaction with Plaintiff and therefore submits this motion without waiver of any jurisdictional arguments, including lack of personal jurisdiction.

an order compelling this action to arbitration per the parties' agreement, and in the alternative to dismiss Steve Beckett's ("Plaintiff") action for failure to state a claim upon which relief can be granted, and in the alternative to strike Plaintiff's class action allegations.

## I.    **INTRODUCTION**

Plaintiff alleges that he was blackmailed by third-party criminals who claimed to have evidence that he purchased illegal pornography and engaged in fraudulent payment card transactions. Threatening Plaintiff with exposure, the criminals demanded he deposit cash into a Bitcoin Depot ATM, which was used to purchase Bitcoin that Plaintiff sent to the extortionists. Unable to recover the Bitcoin from the perpetrators of the extortion, Plaintiff blames Defendants for not preventing him from falling victim to their crime. While the circumstances described by Plaintiff are unfortunate, they are not Defendants' fault.

Plaintiff sues Defendants, asserting claims under Indiana's Deceptive Consumer Sales Act, replevin (I.C. § 32-35-2-1), negligence, and voluntary assumption of duty, and seeking to certify a class of allegedly similarly situated individuals. As a threshold matter, Plaintiff's transactions are governed by the Bitcoin Depot Terms and Conditions, which were presented to him at the Bitcoin Depot ATM and which he expressly accepted at the time of his initial transaction and account opening. The Terms and Conditions contain a broad mandatory arbitration provision requiring all claims arising from the agreement—including statutory, contract, and tort claims—to be resolved by arbitration. Under well-settled federal and Indiana law, such arbitration agreements must be enforced.

The enforceability of Bitcoin Depot's arbitration provision was recently litigated and resolved in *Mooneyham v. Bitcoin Depot, Inc.*, No. 3:24-cv-01774-JDA, 2025 WL 641722 (D.S.C. Feb. 27, 2025), a case virtually identical to this action. In *Mooneyham*, the plaintiff likewise alleged

she was defrauded by third parties into depositing funds at a Bitcoin Depot ATM, sought to bring a putative class action, and challenged the enforceability of the same arbitration provision at issue here. The *Mooneyham* District Court compelled arbitration and dismissed the action, holding that: (1) the plaintiff's acceptance of the Terms and Conditions—including the arbitration clause—was enforceable; (2) all claims asserted, regardless of their characterization, fell within the broad scope of the arbitration agreement; and (3) any defenses to contract formation or claims of duress must be decided by the arbitrator, not the court. *See id*. The Terms and Conditions and arbitration provision at issue here are substantively identical. This Court should follow the persuasive and well-reasoned decision in *Mooneyham* and grant Defendants' motion to compel arbitration and stay or dismiss this action. *See id.*

Alternatively, even if the Court declines to compel arbitration, Plaintiff's claims fail on their merits for the reasons below. Bitcoin Depot cannot be held liable for the criminal acts of third-party scammers, especially considering the robust warnings and safeguards provided. If any claims remain after arbitration and dismissal are addressed, the Court should also strike Plaintiff's class allegations, as individual issues of causation and damages predominate, and Plaintiff cannot satisfy the requirements for injunctive relief.

For these reasons, and consistent with recent authority, Bitcoin Depot respectfully requests that this Court compel arbitration, stay or dismiss this action, and, in the alternative, strike Plaintiff's class allegations.

## II.    **FACTUAL BACKGROUND**

Defendants are Delaware companies. Bitcoin Depot Operating, LLC's principal place of business is in Georgia. Compl., ⁋ 9.[2] Bitcoin Depot Operating, LLC owns and operates Bitcoin Depot ATMs across the country. Declaration of Philip Brown in Support of Defendants' Motion ("Brown Declaration") ⁋ 3. Bitcoin Depot ATMs let users deposit cash to buy Bitcoin.  Before confirming the transaction, the ATM displays a $3.00 flat fee and the specific rate at which the user will purchase Bitcoin. Brown Declaration ⁋ 4, Ex. A at ⁋ 9.1, Ex. D (the customer is shown the exact amount of Bitcoin they will receive for their cash payment). After deducting these amounts, the remainder of the cash is converted to Bitcoin, which is sent to the wallet address designated by the user. Brown Declaration ⁋ 4, Ex. A at ⁋ 4.1. Bitcoin Depot ATMs are located in various locations across the country.

Plaintiff alleges that on December 16, 2024, he received messages from imposters on his computer claiming that his screen was locked and directing him to call Microsoft at a provided number. Compl., ⁋ 70. Plaintiff called the number provided by the imposters and willingly granted them access to his computer. Compl., ⁋ 70. The scammers told Plaintiff they saw activity on his account resulting in purchases of illegal pornography, including child pornography, and claimed that law enforcement was involved, and Plaintiff's financial accounts were at risk. Compl. ⁋ 72. The scammers instructed Plaintiff to "secure" his funds and "resolve the alleged criminal activity" by depositing cash into Bitcoin ATMs. Compl. ⁋ 73.

---

[2] The Philip Brown Declaration is provided in relation to the Motion to Compel Arbitration. Defendants also respectfully request that the Court consider the cited exhibits on a Rule 12(b)(6) motion consistent with Seventh Circuit authority: "When ruling on a motion to dismiss, the court may consider documents attached to the complaint, documents central to the complaint and referred to in it, and information that is properly subject to judicial notice." *Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, fn. 2 (7th Cir. 2017) (internal quotations and ellipses omitted) (citing *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013)).

On December 16, 2024, Plaintiff withdrew $4,000 from his bank and deposited it, during two transactions, into a Bitcoin Depot ATM in Indiana. Compl. ℙ 74-76. On December 17, 2024, Plaintiff withdrew another $3,100 and deposited $3,000 to the same Bitcoin Depot ATM. Compl. ℙ 77.

Prior to initiating his first transaction on December 16, 2024, Plaintiff agreed to Bitcoin Depot's Terms and Conditions. Brown Declaration ℙ 10(c), Ex. E. Bitcoin Depot's Terms and Conditions provide:

> The parties hereby agree to arbitrate all claims that may arise under the Agreement. Without limiting the foregoing, should a dispute arise between the parties (including the Covered Parties) including, without limitation, any matter concerning the Bitcoin Depot Offerings, the terms and conditions of the Agreement or the breach of the same by any party hereto: (a) the parties agree to submit for resolution by arbitration before the American Arbitration Association ("AAA") in Atlanta, GA, in accordance with the current Commercial Arbitration rules of the AAA…

Brown Declaration ℙ 6, Ex. A at ℙ 17.1.

Bitcoin Depot's Terms and Conditions also state, in capital letters:

> THE AGREEMENT CONTAINS DISCLAIMERS OF WARRANTIES, LIMITATIONS OF LIABILITY, RELEASES, A CLASS-ACTION WAIVER, AND THE REQUIREMENT TO ARBITRATE ANY AND ALL CLAIMS THAT MAY ARISE HEREUNDER AGAINST BITCOIN DEPOT, AS WELL AS ITS PARENT, SUBSIDIARIES, RELATED PARTIES, THIRD-PARTY SERVICE PROVIDERS AND MARKETING PARTNERS (COLLECTIVELY, "COVERED PARTIES"), WHO ARE EXPRESS THIRD-PARTY BENEFICIARIES OF THE MANDATORY ARBITRATION PROVISION. THE AFOREMENTIONED PROVISIONS ARE AN ESSENTIAL BASIS OF THE AGREEMENT.

*Id.,* Ex. A, introductory paragraphs.

At the ATM, Plaintiff was shown numerous informational warnings and screens. Brown Declaration ℙ 10-12. One of the first screens asked for his mobile number to send a verification code, and included a message stating, in red text, "If someone else sent you to this machine and

- 5 -

provided you with a QR Code or wallet ID to send funds to, it is most likely a scam." Brown Declaration, Ex. D at p. 3. Plaintiff was then asked to create and verify a secret PIN. Brown Declaration ₱ 10(b), Ex. D at p. 4.

Next, another screen on the ATM was displayed to Plaintiff, including a disclaimer with a copy of the Terms and Conditions, which Plaintiff accepted by selecting "I accept these terms and conditions" to open an account and continue the transaction. Brown Declaration ₱ 10(c), Ex. D at p. 4. After accepting the Terms and Conditions, Plaintiff was sent a text warning to his phone which stated: "Warning! Don't use Depot's ATMs for payments to any govt entities, law enforcement, employers, tech support companies, and significant others, as it's likely a scam. Don't use a QR code provided by a 3rd party. Need help? Call 678-435-9604." Brown Declaration ₱ 10(d), Ex. D at p. 4. Plaintiff then proceeded to finish setting up his account, including submitting his identifying information. Brown Declaration ₱ 10(e), Ex. D at p. 5.

After entering his identification information and secret PIN, one of the next screens included a prompt stating, "ARE YOU BEING SCAMMED?" and warned the user "Do not buy bitcoin for IRS payments, if someone says you have been hacked or are being investigated, or if someone is trying to access your computer or bank account. These are scams!" Brown Declaration ₱ 10, Ex. D at p. 10. The same message also stated, in capital letters: "WARNING: LOSSES DUE TO FRAUDULENT OR ACCIDENTAL TRANSACTIONS MAY NOT BE RECOVERABLE AND TRANSACTIONS IN VIRTUAL CURRENCY ARE IRREVERSIBLE." *Id.*

As noted above, to open his account, Plaintiff selected "I accept these terms and conditions." Brown Declaration ₱ 10(c), 11. Plaintiff would not have been able to proceed with his transactions without agreeing to the Terms and Conditions. Brown Declaration ₱ 11. Plaintiff's selection—agreeing to the Terms and Conditions—was recorded by the ATM in metadata. Brown

Declaration ℙ 11, Ex. E. He was also shown the warnings and pop-ups referenced above during each of the three completed transactions. Brown Declaration ℙ 11.

To complete a transaction, a user must scan a QR code that contains a link to a Bitcoin wallet. Brown Declaration ℙ 12. The user is then given another prompt stating: "Does this wallet belong to you?" There are two options provided: "No, it's someone else's" and "Yes, it's mine." Brown Declaration ℙ 12 Ex. D at p. 11. The user must select "Yes, it's mine" to continue the transaction. *Id.* If a user selects "No, it's someone else's" the user is directed to a prompt that states "WARNING" in red letters and:

> Bitcoin Depot terms of service require all users to use Bitcoin wallets that they own. You selected that you do not own the wallet you are attempting to use.
>
> Never scan a QR code that has been provided to you from a 3rd party. Remember Bitcoin transactions are final and irreversible. QR codes provided to you by government entities including the IRS, law enforcement, employers, technical support companies, someone saying you've been hacked and significant other could be scams. Please contact Bitcoin Depot customer support if you have questions about scams: (678) 435-9604. In order to proceed you will need to create your own Bitcoin wallet and provide the Bitcoin wallet address QR code from that wallet.

Brown Declaration ℙ 12, Ex. D at p. 11. If the user says that he or she is using someone else's Bitcoin wallet, the transaction is then cancelled, and the user is given the option to start a new transaction and download their own Bitcoin wallet. Brown Declaration ℙ12, Ex. D at p. 11.

Here, Plaintiff falsely confirmed—on three separate occasions—that the Bitcoin wallet to which he was sending the Bitcoin, purchased from Bitcoin Depot's inventory, was his own digital wallet. Brown Declaration ℙ 13. This representation violated Bitcoin Depot's Terms and Conditions, and the multiple warnings displayed during the transaction process. Brown Declaration, Exs. A and D.

## III.    THIS COURT SHOULD COMPEL ARBITRATION

### A.    *Legal Standard*

The Seventh Circuit has made clear that "agreements to engage in alternative dispute resolution must be enforced, if they are valid as a matter of state contract law[.]" *Riviera Distribs. v. Jones*, 517 F.3d 926, 929 (7th Cir. 2008). Further, Section 2 of the FAA provides that an agreement to arbitrate shall be "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" 9. U.S.C. § 2. The U.S. Supreme Court and the Indiana Supreme Court[3] have recognized a public policy favoring arbitration. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (superseded by statute on other grounds) ("[T]he Courts of Appeals have since consistently concluded that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration. We agree."); *Land v. IU Credit Union*, 218 N.E.3d 1282, 1286 (Ind. 2023) ("Indiana recognizes a strong policy interest in favor of enforcing arbitration agreements."). "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Moses H. Cone*, 460 U.S. at 24-25.

---

[3] Defendants contend that Georgia law would apply under the Terms and Conditions, which expressly state: "The Agreement shall be treated as though it were executed and performed in Atlanta, Georgia and shall be governed by and construed in accordance with the laws of the State of Georgia (without regard to conflict of law principles)." Brown Declaration, Ex. A, ¶ 17.1. However, analysis of this motion would be the same using Seventh Circuit or Eleventh Circuit precedent (or generally under the laws from Indiana or Georgia). On a motion to compel arbitration, the Court must determine whether (1) a valid, written agreement to arbitrate exists; (2) the issues are arbitrable under the agreement, and (3) Plaintiff has failed or refused to arbitrate the claims. *See Akpele v. Pac. Life Ins. Co.*, 646 Fed. Appx. 908, 912 (11th Cir. 2016); *see also Green v. CVS Health*, No. 3:23-cv-00076-TES, 2023 WL 7287202 at *1 (Nov. 3, 2023) (citing *Collins v. Intl. Dairy Queen, Inc.*, 2 F. Supp. 2d 1465, 1468 (M.D. Ga. 1998)); *Wilson v. Cracker Barrel Old Country Store, Inc.*, No. 2:22-CV-195-RWS-JCF, 2023 WL 10476032 at *4 (Jan. 30, 2023); *Ijeh v. Suntrust NOW Trust*, No. 1:21-CV-04749-ELR, 2022 WL 3699964 at *3(May 11, 2022).

"[A] party may apply to a federal court for a stay of the trial of an action 'upon any issue referable to arbitration under an agreement in writing for such arbitration.'" *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010) (quoting 9 U.S.C. § 3); *Kost v. PNC Bank, N.A.*, No. 4:15-cv-00056, 2015 WL 5521817, at *4 (S.D. Ind. Sept. 17, 2015) ("If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court . . . shall . . . stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]") (quoting 9 U.S.C. § 3). A litigant can compel arbitration under the FAA if they can demonstrate: "(1) an agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal by the opposing party to proceed to arbitration." *Farris v. W. & S. Life Ins. Co.*, No. 1:14-cv-421, 2014 WL 5465947, at *2 (S.D. Ind. Oct. 28, 2014) (quoting *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 466 F.3d 577, 580 (7th Cir. 2006)).

### B. *Discussion*

This case meets all three requirements for mandatory arbitration. There is a written agreement to arbitrate, which is all that is necessary for the first prong. *Zurich Am. Ins. Co. v. Watts Indus.*, 417 F.3d 682, 690 (7th Cir. 2005). Plaintiffs' claims fall under the arbitration provision in the Terms and Conditions, which expressly state that "[t]he parties hereby agree to arbitrate all claims that may arise under the Agreement." Brown Declaration, Ex. A ¶ 17.1. The broad language of this provision is intended to cover all disputes between the parties. Moreover, the Seventh Circuit has held that "any dispute between contracting parties that is in any way connected with their contract could be said to 'arise out of' their agreement and thus be subject to arbitration under a provision employing this language." *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 642 (7th Cir. 1993); *see also Konecranes, Inc. v. Davis*, No. 1:12-

cv-01700, 2013 WL 5701046, at *3 (S.D. Ind. Oct. 18, 2013) (citing *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.,* 174 F.3d 907, 910 (7th Cir.1999) and *Nat'l Wine & Spirits, Inc. v. Ernst & Young, LLP*, 976 N.E.2d 699, 706 (Ind. 2012)) ("Arbitration provisions contemplating all claims 'arising out of, or relating to' an agreement between parties have been interpreted very broadly, creating a presumption of arbitrability. In fact, the Indiana Supreme Court has described such provisions as having 'all-encompassing language.'"). "Whether a particular claim is arbitrable depends not upon the characterization of the claim, but upon the relationship of the claim to the subject matter of the arbitration clause." *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1036 (7th Cir. 2012) (quoting *In re Oil Spill by the "Amoco Cadiz" off the Coast of France March 16, 1978*, 659 F.2d 789, 794 (7th Cir. 1981)).

Plaintiff's Complaint contains four claims: Violation of Indiana Deceptive Sales Act (Count I), Replevin, I.C. § 32-35-2-1 (Count II), Negligence/Gross Negligence/Recklessness (Count III), and Voluntary Assumption of Duty (Count IV). Each claim falls within the scope of the agreement's broad arbitration provision. Plaintiff was prompted to review and accept the terms at the Bitcoin Depot ATM before opening an account and completing the transactions, which he did by selecting "I accept these terms and conditions." Brown Declaration, Ex. D p. 4, Ex. E. The arbitration provision is broad, and Plaintiff accepted the full Terms and Conditions, so the Court should conclude that all claims within the current dispute fall under those Terms.

In fact, as noted above, courts have recently enforced the same arbitration provision in similar factual circumstances. In *Mooneyham v. Bitcoin Depot, Inc.*, No. 3:24-cv-01774-JDA, 2025 WL 641722 (D.S.C. Feb. 27, 2025), the United States District Court for the District of South Carolina granted a motion to compel arbitration and dismissed the action where the plaintiff, as here, accepted Bitcoin Depot's Terms and Conditions—including a mandatory arbitration

clause—before completing transactions at a Bitcoin Depot ATM. *Id.* at *3-*5. The court found that all claims asserted in that putative class action, including statutory, tort, and contract claims, fell within the scope of the broad arbitration provision. *Id.* at *5. The court further rejected the plaintiff's arguments regarding contract formation and duress, holding that such defenses must be decided by the arbitrator under controlling Supreme Court precedent. *Id.* at *4. Accordingly, *Mooneyham* provides persuasive, recent authority that supports compelling arbitration and staying or dismissing this action.

Lastly, a plaintiff refuses to proceed to arbitration where they (1) have filed a lawsuit and (2) oppose the defendant's motion to compel arbitration. *See Extremely Clean Cleaning Servs., LLC v. CAAT, Inc.*, No. 1:18-cv-02968, 2019 WL 934891, at *2 (S.D. Ind. Feb 25, 2019) ("Plaintiffs have demonstrated their refusal to submit to arbitration by filing this lawsuit and by their opposition to Defendants' motions to stay."). Plaintiff Beckett has filed the instant lawsuit against Defendants. While the case timeline is not at a point that Plaintiff has had the opportunity to demonstrate explicit refusal to arbitrate, his request to certify for a class action, award Plaintiff and theoretical class members all possible damages, and award interest, attorneys' fees, and costs, demonstrate an intent to continue the suit and thereby an implied refusal to arbitrate. Compl. p. 41; *see also Pekin Ins. Co. v. Hanquier*, 984 N.E.2d 227, 229 (Ind. Ct. App. 2013) ("Once the court is satisfied that the parties contracted to submit their dispute to arbitration, the court is required by statute to compel arbitration."). Accordingly, the Court should find that Plaintiff has refused to proceed to arbitration.

Plaintiff's dispute should be governed by the arbitration provisions he agreed to, especially in light of the strong public policy in favor of arbitration. This Court should stay or dismiss this action and compel arbitration, as recently done in *Mooneyham v. Bitcoin Depot, Inc.*, No. 3:24-cv-

01774-JDA, 2025 WL 641722 (D.S.C. Feb. 27, 2025) (compelling arbitration and dismissing all claims brought against Bitcoin Depot under the same arbitration provision here).

## IV.   IN THE ALTERNATIVE, THIS COURT SHOULD DISMISS PLAINTIFF'S COMPLAINT

### A. *Legal Standard*

To survive a motion to dismiss, Plaintiff Beckett's Complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wertymer v. Walmart, Inc.*, 142 F.4th 491, 495 (7th Cir. 2025) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Plaintiff "must go beyond mere speculation or conjecture and provide factual allegations that allow the court to draw a reasonable inference" that Defendants could be at fault. The plausibility standard is not a probability requirement, but "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

### i. *This Court Should Dismiss the Indiana Deceptive Consumer Sales Act Claim*

Plaintiff has failed to allege facts sufficient to maintain a claim under the Indiana Deceptive Consumer Sales Act ("IDCSA"). To properly plead a claim under IDCSA's private right of action, Plaintiff must allege both reliance on an "uncured or incurable deceptive act" and, to recover enhanced damages, a "willful deceptive act," as defined by the statute. *Gasbi, LLC v. Sanders*, 120 N.E.3d 614, 620 (Ind. Ct. App. 2019) (citing Indiana Code § 24-5-0.5-4) ("[T]he Consumer Act allows recovery only for deceptive acts that are 'incurable' or 'uncured.'"). Plaintiff fails to meet these requirements.

a.    <u>**Plaintiff Has Failed to Allege Defendants Engaged in Incurable Deceptive**</u>
      <u>**Acts**</u>

Plaintiff alleges that Defendants engaged in "incurable deceptive acts" under IDCSA § 24-5-0.5-2(a)(8) because their "practices were committed as part of a systematic scheme, artifice, or device with intent to defraud or mislead vulnerable consumers." Compl. ⁋ 119. Plaintiff's allegations, even when viewed in the light most favorable to Plaintiff, do not satisfy the heightened pleading requirement for fraud under both Indiana and federal law.

Allegations of fraud—including claims that the Bitcoin Depot Defendants engaged in incurable deceptive acts—must be pleaded with particularity. Fed. R. Civ. P. 9(b) (mandating that a party "state with particularity the circumstances constituting fraud or mistake"); *see also McKinney v. State*, 693 N.E.2d 65, 65-68 (Ind. 1998) (noting that "intent to defraud or mislead is thus clearly an element of an incurable deceptive act"). Rule 9(b) requires that a party "state with particularity the circumstances constituting fraud or mistake," requiring plaintiffs to allege the "who, what, when, where, and how" of the alleged misconduct. *See, e.g., United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009).

Plaintiff's Complaint falls far short of these standards. The allegations purporting to show intent are vague, conclusory, and unsupported by facts. Plaintiff does not allege what specific representations were made to him, who made them, when or where they were made, or what statements were false and how. Instead, Plaintiff points to general practices and to educational materials and warnings displayed on Bitcoin Depot's website and ATMs—facts that undermine his theory by showing Defendants took steps to warn consumers about potential fraud. *See* Compl. ¶¶ 36–37, 44, 59–60.

Plaintiff's attempt to plead intent to defraud is equally deficient. The examples provided in Paragraph 120 of the Complaint boil down to two speculative theories: first, that Defendants' actual knowledge of the risk that their ATMs may be used for third-party fraud is equivalent to intent to defraud; and second, that the existence of third-party fraud means Defendants must have intended to profit from transaction fees generated by fraudulent activity. Compl. ¶ 120(b)-(d). Neither theory is supported by factual allegations, and both fail as a matter of law.

Generalized knowledge that bad actors may misuse a service does not equate to fraudulent intent. As the Iowa Supreme Court recently held in *Bitcoin Depot Operating, LLC v. Carlson*, 21 N.W.3d 157, 164 (Iowa 2025):

> Bitcoin Depot's generalized knowledge that sometimes scammers try to defraud people into transferring Bitcoins using Bitcoin's irreversibly encoded technology is insufficient to establish that Bitcoin Depot had 'reason to know' of [a particular consumer's alleged] duress. . . That Bitcoin Depot recognizes how its ATMs could be misused and tries to warn its customers  . . . does not in and of itself undermine the validity of the contract between Bitcoin Depot and the depositing customer just because a scammer is successful.

The mere fact that Defendants operate an ATM with which a criminal actor chose to commit a crime does not mean they acted with intent to commit fraud. Holding otherwise would mean any company that sells anything that can be corrupted by a criminal would be found liable under IDCSA and similar statutes. As a public policy matter, companies should not be disincentivized from warning customers of a possible risk by imputing malintent to educate customers on how to prevent being victimized by third parties.

Nor does the presence of third-party fraud establish that Defendants intended to profit from such activity. The connection is far too attenuated, and the IDCSA is not designed to impose liability on legitimate businesses simply because their services can be misused. To analogize, banks and wire transfer services do not possess fraudulent intent merely because their channels are

- 14 -

sometimes used for criminal purposes. *See Carlson, 21 N.W.3d 157*, at 165 ("[T]he fact that Bitcoin Depot recognized risks in its industry and the use of its ATMs and then warned its customers—to the point of barring a transaction unless the user certifies that the wallet is their own—does not make it liable for every improper transaction.")

### b.    Plaintiff Has Failed to Allege Reliance

To recover under IDCSA § 24-5-0.5-4(a), Plaintiff must allege he "rel[ied] upon an…incurable deceptive act." IDCSA § 24-5-0.5-4(a). Plaintiff's broad, generalized pleadings never allege that he entered his ATM transactions in reliance on any alleged representation by Defendants about safety. *See* Compl. ¶¶ 113-128. In fact, Plaintiff specifically pleads that he did *not* rely on the warnings displayed by the Bitcon ATM. Compl. ¶ 78 (noting that it was only after completing his third transaction that "Plaintiff Beckett began to notice fraud warnings associated with Bitcoin ATM usage and started to question whether something might be wrong with the situation"). Because Plaintiff failed to plausibly allege reliance, his claim should be dismissed.

### ii.    *This Court Should Dismiss Plaintiff's Claim for Replevin under Indiana Code § 32-35-2-1*

Plaintiff has not pled his right to possession of the transaction fees Defendants retained as a matter of contract and typical business practice. Indiana courts have established that Plaintiffs who wish to recover under I.C. § 32-35-2-1 must prove the elements of an action for replevin. Thus, Plaintiff Beckett must sufficiently allege "(1) his right to title or right to possession, (2) that the property was unlawfully detained, and (3) that the defendant wrongfully holds possession." *DBS Constr. Inc. v. New Equip. Leasing, Inc.*, 2010 WL 3672220, at *2 (N.D. Ind. 2010) (interpreting I.C. § 32-35-2-1; citing *Whittington v. Indianapolis Motor Speedway Found., Inc.*, 601 F.3d 728, 732 (7th Cir. 2010) and *United Farm Fam. Mut. Ins. Co. v. Michalski*, 814 N.E.2d

1060, 1066 (Ind. Ct. App. 2004)). The burden of showing a right of possession does not pass to Defendants until after Plaintiff Beckett can make a "prima facie case of right to possession of the chattel sought." *Id.* (quoting *United Farm*, 814 N.E.2d at 1068). Importantly, Plaintiff must sufficiently allege facts to show "his right to possession on the strength of his own title, not merely the weakness of the defendant's title or right to possession." *Id.* (quoting *Whittington*, 601 F.3d at 732).

Plaintiff cannot plausibly allege his affirmative right to possession of the transaction fees, nor has he even attempted to do so. Nowhere in Count Two does Plaintiff allege facts to support his brief statement that "Plaintiff Steve Beckett is the rightful owner of and has superior title to" the transaction fees. Compl. ¶ 131. Plaintiff devotes four of nine paragraphs in Count Two to attacks on Defendants' right to the transaction fees but provides no facts supporting his own alleged superior title. Compl. ¶ 132-136. The remaining paragraphs are purely descriptive and do not establish or sufficiently allege Plaintiff's ownership interest. Not only do these alleged facts fail to support Plaintiff's arguments against Defendants' ownership interest, but Plaintiff has also done nothing to allege his own independent right to the fees, in contravention of the standard for claims under I.C. § 32-35-2-1. *See DBS Constr. Inc. v. New Equip. Leasing, Inc.*, 2010 WL 3672220, at *2 (N.D. Ind. 2010) (quoting *Whittington*, 601 F.3d at 732).

Moreover, even in an amended pleading, Plaintiff cannot establish any possessory interest in the transaction fees charged by Bitcoin Depot, as the Terms and Conditions—agreed to by Plaintiff—expressly provide that all fee payments are final and non-refundable. *See* Brown Declaration, Ex. A ¶ 9.2, Bitcoin Depot Terms and Conditions, Section 9.2 ("UNLESS OTHERWISE INDICATED, ALL FEE PAYMENTS ARE FINAL AND NON-REFUNDABLE.")

Furthermore, the "fees and charges" identified are not specific personal property subject to a replevin action. "'The action of replevin lies, where specific personal property has been wrongfully taken or [*sic*] detained, to recover possession of the property, together with damages for its detention.'" *Winters v. Pike*, 171 N.E.3d 690 (Ind. Ct. App. 2021) (quoting Replevin, BLACK'S LAW DICTIONARY (11th ed. 2019)). An action seeking a general sum of money or currency is not the proper subject of a replevin action unless the money was specifically marked and capable of identification. *See, e.g.*, *Daenzer v. Wayland Ford, Inc.*, 193 F.Supp.2d 1030, 1041 (W.D. Mich. 2002) (dismissing replevin claim seeking to recover general finance charges that were allegedly wrongfully collected) (overruled in part on other grounds).

Even if the allegations in the Complaint plausibly plead an actionable replevin claim, this claim still fails as courts across the country have recognized a Bitcoin ATM kiosk operator's superior property right to cash deposited to purchase cryptocurrency. The Iowa Supreme Court in 2025 upheld this characterization of Defendant's property rights in a case with very similar facts to Plaintiff's allegations, as noted above. *In re Prop. Seized for Forfeiture from Bitcoin Depot Operating, LLC*, 21 N.W.3d 157 (Iowa Sup. Ct. 2025). In *Carlson*, the plaintiff, a Bitcoin customer, deposited $14,000 into a Bitcoin ATM in response to a scam. *Id.* at 159-161. Like Plaintiff Beckett, Carlson proceeded through a menu of warnings, agreed to the Terms of Service, and falsely certified that the Bitcoin wallet to which she transferred funds was her own. *Id.* The Iowa Supreme Court held that, as between Bitcoin Depot and Carlson, Bitcoin Depot had the "greater right to possession of the…seized funds." *Id.* at 159. Rejecting Carlson's attempt to analogize between Bitcoin Depot and the pawnbroker industry, which in some circumstances mandates that pawnbrokers return stolen property to their rightful owners upon demand, the Court held:

> Bitcoin Depot is not a pawnbroker…and even if the analogy fit, Carlson's transaction with Bitcoin Depot did not involve stolen property. Rather, Carlson deposited her own cash that she withdrew from her personal bank account into a Bitcoin ATM….The Bitcoins were what were stolen, not the cash deposited into the Bitcoin ATM….As between Carlson and Bitcoin Depot [the rightful owner] is Bitcoin Depot.

*Id.* at 162, 165.

Plaintiff's whole theory of recovery under I.C. § 32-35-2-1 is inapplicable to Defendants, as Bitcoin Depot is the lawful owner of the cash that Plaintiff deposited into Bitcoin Depot's ATM, part of which constituted the transaction fees. If anyone has "wrongfully taken or unlawfully detained" property, it is the scammers.

### iii.    This Court Should Dismiss Plaintiff's Tort Claims (Counts Three and Four)

Plaintiff brings several tort claims against Defendants—including negligence, gross negligence, recklessness, and voluntary assumption of duty. These claims fail for multiple reasons and should be dismissed.

First, the economic loss doctrine is a complete bar to Plaintiff's tort claims. Indiana law does not allow plaintiffs to recover in tort for purely economic losses arising out of a contractual relationship. *See Indianapolis-Marion County Pub. Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 726-27 (Ind. 2010) (citing *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 153 (Ind. 2005)). The relationship between Plaintiff and Bitcoin Depot is governed by the Terms and Conditions, which Plaintiff accepted. All of Plaintiff's alleged losses—including fees and lost funds—are economic and stem from that contract. Indiana courts have repeatedly held that where parties have allocated their risks by contract, tort law should not interfere. *See Jaffri v. JPMorgan Chase Bank*, N.A., 26 N.E.3d 635, 638 (Ind. Ct. App. 2015) ("[w]hen the parties have, by contract, arranged their respective risks of loss, . . . the tort law should not interfere.").

Second, Plaintiff fails to plausibly allege that Defendants owed him any legal duty outside of the contract. Indiana courts have made clear that the existence of a contractual relationship, including customer relationships with banks or financial service providers, does not create a special or fiduciary duty. *See Wilson v. Lincoln Fed. Sav. Bank*, 790 N.E.2d 1042, 1046 (Ind. Ct. App. 2003) ("a business or 'arm's length' contractual relationship does not give rise to a fiduciary relationship"). Plaintiff's reliance on his age, alleged vulnerability, or supposed "obvious warning signs" is not enough to create a heightened duty of care. Compl., ¶ 146. Courts have rejected the imposition of degrees of negligence in Indiana, meaning there is no special duty owed between any parties in tort. *Neal v. Home Builders, Inc.*, 232 Ind. 160, 168-69 (Ind. 1953) ("There are no degrees of negligence in the State of Indiana, neither are there degrees of care").

Plaintiff also invokes the voluntary assumption of duty doctrine, but this theory does not support his claim. Indiana law recognizes this doctrine only in narrow circumstances, typically where a party undertakes to protect another from physical harm and the other relies on that undertaking. *See Yost v. Wabash College*, 3 N.E.3d 509, 518 (Ind. 2014) (holding that college's general policies, procedures for reporting and discipline, and investigations into violations of policy were insufficient to establish a voluntary assumption of a duty). Here, Plaintiff alleges only economic losses, not physical harm, and does not plausibly allege that he relied on any specific undertaking by Defendants. General statements about customer protection, scam warnings, or educational materials do not create the sort of specific, affirmative undertaking required to impose a new legal duty.

Even if a duty were somehow found, Plaintiff does not allege facts showing breach. That Plaintiff was the victim of *third-party fraud* does not mean *Defendants* failed to exercise reasonable care. Plaintiff's allegations, at most, suggest a desire for strict liability whenever a fraud

occurs—an approach Indiana law does not support. *See Eby v. York-Division, Borg-Warner*, 455 N.E.2d 623, 628 (Ind. Ct. App. 1983) (laying out the elements of actual and constructive fraud, which include material misrepresentation, reliance, and, for actual fraud, intentional or reckless deception). Defendants provided warnings and educational materials, and Plaintiff does not plausibly allege that these efforts fell below any applicable standard of care.

Plaintiff's claims also fail on causation. Indiana courts hold that the independent criminal acts of third parties break the chain of causation for negligence claims. *See Merchants Nat. Bank v. Simrell's Sports Bar & Grill, Inc.*, 741 N.E.2d383, 389 (Ind. Ct. App. 2000) ("[A] willful, malicious criminal act of a third party is an intervening act that breaks the causal chain between the alleged negligence and the resulting harm."). The real cause of Plaintiff's loss was the fraud perpetrated by third-party scammers, not any act or omission by Bitcoin Depot. *See id.* ("While proximate cause is generally a question of fact, it becomes a question of law where only a single conclusion can be drawn from the facts.")

Finally, Plaintiff's attempt to plead "recklessness" and "voluntary assumption of duty" as standalone causes of action is legally deficient. Indiana law does not recognize these as independent torts; recklessness pertains to a heightened level of fault in tort law, while voluntary assumption of duty involves the creation of a duty of care through affirmative conduct. *See Ford Motor Co. v. Ammerman*, 705 N.E.2d 539, 557 (Ind. Ct. App. 1999) (analyzing recklessness strictly to inform the presence of gross negligence and to determine punitive damages). While voluntary assumption of duty can give rise to a duty for purposes of a negligence claim, it does not stand alone as a cause of action. *See, e.g.*, *Yost v. Wabash College*, 3 N.E.3d 509 (Ind. 2014) ("A duty of care may…arise where one party assumes such a duty, either gratuitously or voluntarily" [quoting *Delta Tau Delta, Beta Alpha Chapter v. Johnson*, 712 N.E.2d 968 (Ind. 1999) (overruled

in part, on other grounds)]); *D.H. by A.M.J. v. Whipple*, 103 N.E.3d 1119, 1130 (Ind. Ct. App. 2018) (quoting same).

## V.    THIS COURT SHOULD STRIKE THE CLASS ALLEGATIONS

This case is ill-suited to a class action format. If the Court does not compel arbitration or dismiss the Complaint in its entirety, Defendants request, in the alternative, that the Court strike Plaintiff's class allegations.

First, the Terms and Conditions expressly prohibit class actions. *See* Brown Declaration Ex. A, introductory paragraphs and ⁋ 17.1; *see also* Scroggins v. Uber Technologies, Inc., No. 1:16-cv-01419-SEB-MJD, 2017 WL 373299 at *2–3 (S.D. Ind. Jan. 26, 2017) (class action waiver did not make arbitration agreement unconscionable).

Moreover, the specific circumstances alleged in the Complaint show that the individual facts and issues involved in each alleged class member's use of Defendants' ATM for a fraudulent transaction would overwhelm any limited common questions shared by the claimed class. Plaintiff seeks to certify a class comprised of "[a]ll persons who, during the Class Period, completed a cash-to-Bitcoin transaction at a Bitcoin Depot ATM located in Indiana as part of an impersonation scam, and who (a) reported the fraudulent transaction to Bitcoin Depot, law enforcement, or any government agency, or (b) made such transaction under circumstances that provided Bitcoin Depot with actual or constructive notice of the fraudulent nature of the transaction." Compl., ¶ 103. This class definition on its face makes clear that it does not meet the requirements set out in the Federal Rules of Civil Procedure, nor could it by amended pleading.

### A.  Legal Standard

Federal Rule of Civil Procedure 23(d)(1)(D) provides that a court may issue orders that require the pleadings be amended to eliminate allegations about a representation of absent persons

and that the action proceed accordingly. Rule 12(f) of the Federal Rules of Civil Procedure permit courts to strike the class allegations where, from the face of the complaint, "no possible set of factual allegations… could justify certifying a class." *Drake v. Mirand Response Systems, Inc.*, Case No. 1:19-cv-01458-RLY-DML, 2020 WL 4218335 at *2 (S.D. Ind. 2020). In the Seventh Circuit, this rule authorizes a district court to dismiss or strike class allegations where the pleading makes clear that the purported class cannot be certified, and no amount of discovery would change that determination. *See, e.g., Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 563 (7th Cir. 2011) (holding that a court "need not delay a ruling on certification if it thinks that additional discovery would not be useful in resolving the class determination"). Indeed, the Court should address class allegations at the pleading stage "where the pleadings are facially defective or inherently deficient." *Dowding v. Nationwide Mutual Ins. Co.*, 490 F.Supp.3d 1291, 1298 (N.D. Ind. 2020).

### i. *Plaintiff Cannot Meet Commonality and Predominance Requirements*

Federal Rule of Civil Procedure 23(a) provides that one or more members of a class may sue as a representative party on behalf of all if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Under Federal Rule of Civil Procedure 23(b), a class must also be a permissible "type of class action." Plaintiff is apparently attempting to seek to certify a class under Rule 23(b)(2) and Rule 23(b)(3). Compl., ¶ 112. Rule 23(b)(3) provides for the ability to certify a class where the court finds that questions of law or fact common to class members predominate over any question affecting only individual members, and that a class is superior to other available methods for fairly and efficiently adjudicating the controversy.

It is clear from the face of Plaintiff's Complaint that he will be unable to meet either the commonality requirement of Rule 23(a) or the predominance requirement of Rule 23(b). The commonality requirement demands that there are questions of law or fact common to the class. All class members should "have suffered the same injury at the hands of the same defendant." *McCaster v. Darden Restaurants, Inc.*, 845 F.3d 794, 800 (7th Cir. 2017) (internal quotations omitted). Plaintiffs must also show that "the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members." *Id.* (quoting *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014)). To satisfy the predominance requirement, the common questions of law and fact must predominate over any questions affecting only individual members. *See Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014).

Here, there are numerous dissimilarities between putative class members that would require the Court to make inherently particularized inquiries into the nature of each putative class members' transactions. Plaintiffs cannot merely allege "systemic" deficiencies to establish commonality. *See Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481, 498 (7th Cir. 2012). The only alleged commonality here would be the claimed use of a Bitcoin Depot ATM as a conduit for a third-party criminal to trick individuals into purchasing and sending Bitcoin to the criminal's wallet. But this alleged "commonality" would require individual trials and determinations for every single potential class member to determine whether they suffered such an injury—there is no common proof of injury that could be presented. Indeed, the potential class members in this case will have key distinct factual differences and individualized evidence for each potential member, such as: (1) what scam the threat actors engaged in, (2) how they allegedly duped each class member, (3) whether there were other intervening causes or actions that occurred that could have prevented the scam, (4) whether the fraud was reported to the police, and (5) what efforts

were made to recover the funds and whether those were effective. In addition, differences in the class members' ages, as well as differences in their interactions with Defendants, such as how they used an ATM, and where they used an ATM. Even at this early stage, the case cannot meet Rule 23 requirements for commonality or predominance, and the class allegations should be stricken.

The Seventh Circuit has also held that establishing predominance "required more than a tally of common questions; the district court must consider their relative importance." *Eddlemon v. Bradley University*, 65 F.4th 335, 339 (7th Cir. 2023) ("the predominance requirements is [only] met when common questions represent a *significant* aspect of the case."). As discussed *supra*, Plaintiff's claims require a showing of actual injury and damages. Should Plaintiff be allowed to proceed with a class action, the matter would be dominated completely by individualized inquiries into numerous matters. Chief among these issues is the extent of each putative class member's injury and damages. There is no mechanism Plaintiff could allege that would provide for assessment of damages on a class-wide basis. Instead, the Court will be forced to hold dozens of mini-trials for each individual class member to determine the amount of money they allege they lost (not to mention whether they were even injured by an alleged scam, as noted above). This falls squarely into the types of situations that the Seventh Circuit found to defeat predominance, and predominance should be similarly defeated here. *See, e.g.*, *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 844 (7th Cir. 2022) (affirming denial of motion to certify class related to TCPA violations on predominance grounds); *McFields v. Dart*, 982 F.3d 511, 518–519 (7th Cir. 2022) (affirming denial of class certification in action challenging jail's policy of evaluating complaints of pretrial detainees' dental pain without conducting face-to-face assessments).

a. **Plaintiff Cannot Satisfy the Requirements for Certification Under Rule 23(b)(2)**

Plaintiff also seeks certification of a class under Rule 23(b)(2) for injunctive and declaratory relief. Certification under Rule 23(b)(2) is improper here. Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Supreme Court has made clear that Rule 23(b)(2) is reserved for cases where a single injunction or declaratory judgment would provide relief to each member of the class. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360-61 (2011) ("[Rule 23(b)(2)] does not authorize class certification when each class member would be entitled to an individualized award of monetary damages."); *see also Jamie S.* 668 F.3d 499 ("Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.").

Here, Plaintiff's claims are fundamentally based on individualized monetary losses resulting from distinct impersonation scams and unique factual circumstances surrounding each transaction. The request for injunctive relief is secondary to Plaintiff's primary goal of recovering monetary damages. The Supreme Court has expressly held that certification under Rule 23(b)(2) is not appropriate where claims for monetary relief predominate or where monetary relief is not incidental to the injunctive or declaratory relief. *Dukes*, 564 U.S. at 360-61.

Moreover, Plaintiff cannot show that Bitcoin Depot has acted or refused to act on grounds generally applicable to the class. The circumstances underlying each putative class member's alleged injury—including the nature of the scam, whether any "red flags" were present, whether Bitcoin Depot had actual or constructive notice, and what actions were taken—are highly

individualized. There is no single policy or practice that could be enjoined or declared unlawful as to all class members. Any determination of liability or entitlement to injunctive relief would require individualized findings about each transaction and each class member's interaction with Bitcoin Depot. *See Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 (7th Cir. 2011) (denying Rule 23(b)(2) certification where individualized determinations would be required to find entitlement to relief).

Plaintiff also lacks standing to seek injunctive relief on behalf of the class unless she can demonstrate a real and immediate threat to future injury, not merely a past harm. *See Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects") (*quoting City of Los Angeles v. Lyons*, 461 U.S. 95, 95-96 (1983)). The Complaint does not allege facts showing that Plaintiff or other class members are likely to suffer future harm from Bitcoin Depot's alleged conduct.

Plaintiff cannot satisfy the requirements for class certification under Rule 23(b)(2). The individualized circumstances, predominance of monetary relief, and absence of a generally applicable policy or practice preclude certification under this provision. The class allegations related to Rule 23(b)(2) should therefore be stricken.

## VI.    **CONCLUSION**

For these reasons, Defendants respectfully request this Court compel arbitration and stay this matter, or in the alternative, dismiss the Complaint, or, in the alternative, strike Plaintiff's class allegations.

August 27, 2025

Respectfully submitted,

BITCOIN DEPOT, INC.,
BITCOIN DEPOT OPERATING,
LLC d/b/a/ BITCOIN DEPOT

By their counsel,

*/s/ Nicole Narotzky*

Nicole Narotzky (admitted pro hac vice)
GREENBERG TRAURIG, LLP
90 S. 7th St., Suite 3500
Minneapolis, MN 55402
Tel: 612-259-9700

Jena Valdetero
Illinois Bar No. 06290948
GREENBERG TRAURIG, LLP
360 N Green St. Suite 1300
Chicago IL, 60607
Tel: 312-456-1025
jena.valdetero@gtlaw.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that I caused a true and correct copy of Defendants' **Memorandum of Law** to be electronically filed with the Clerk of the United States District Court for the Southern District of Indiana on August 27, 2025, and served upon the following counsel of record for the Plaintiff by electronic transmission through the Court's ECF system:

Brian D. Flick and Marita I. Ramirez
DannLaw
15000 Madison Avenue
Lakewood, OH 44107

*Attorneys for Plaintiff*

*/s/  Nicole Narotzky*