**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **STEVE BECKETT,** individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>**BITCOIN DEPOT, INC.,** *et al.*<br><br>          Defendants. | Case No. 1:25-cv-01450-TWP-MG<br><br>Judge Tanya Walton Pratt<br>Magistrate Judge Mario Garcia |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS**
**BITCOIN DEPOT, INC. AND BITCOIN DEPOT OPERATING, LLC'S MOTION TO**
**COMPEL ARBITRATION AND STAY OR DISMISS THE ACTION OR IN THE**
**ALTERNATIVE TO DISMISS AND STRIKE CLASS ALLEGATIONS**

Plaintiff Steve Beckett, on behalf of himself and others similarly situated, submits this

response in opposition to Defendants Bitcoin Depot, Inc. and Bitcoin Depot Operating, LLC's

Motion to Compel Arbitration and Stay or Dismiss the Action or in the Alternative to Dismiss

and Strike Class Allegations and requests that the Court deny the motion in its entirety. In

support of this opposition, a brief in support is attached and Plaintiff requests an oral hearing.

Respectfully submitted,

/s/Brian D. Flick
Brian D. Flick (OH #0081605)
Marita I. Ramirez (OH #0110882)*
*Admitted Pro Hac Vice*
DannLaw
15000 Madison Avenue
Lakewood, OH 44107
Phone: 216-373-0539
Fax: 216-373-0536
notices@dannlaw.com
*Attorneys for Plaintiff Steven Beckett and*
*the putative class*

## I.    INTRODUCTION

Plaintiff Steve Beckett, a 66-year-old retiree, fell victim to a sophisticated impersonation scam on December 16, 2024, when criminals claiming to be Microsoft and law enforcement representatives convinced him he faced arrest for fabricated crimes. Under extreme psychological duress and following real-time criminal instructions, Plaintiff deposited $7,000 into Bitcoin Depot ATMs over two days, with Bitcoin Depot retaining approximately $2,000 in fees.

This Court should deny Defendants' motion in its entirety for three fundamental reasons:

*First*, no valid arbitration agreement exists. Bitcoin Depot's Terms contain no clear delegation of arbitrability to an arbitrator, requiring this Court to determine validity. The purported agreement is unconscionable both procedurally and substantively—formed while Plaintiff operated under criminal manipulation on a small ATM screen with no meaningful opportunity to review complex legal terms, and containing one-sided provisions that immunize Bitcoin Depot from liability while guaranteeing it profits from every transaction, including those it knows are fraudulent.

*Second*, Plaintiff states valid claims on the merits. The complaint adequately alleges incurable deceptive acts under the Indiana Deceptive Consumer Sales Act based on Bitcoin Depot's systematic scheme to profit from fraud targeting vulnerable elderly consumers despite actual knowledge of widespread victimization. Plaintiff's replevin claim seeks recovery of fees wrongfully retained after Bitcoin Depot received notice of fraud. The tort claims are based on Bitcoin Depot's voluntary assumption of protective duties through extensive public safety representations and its breach of reasonable care despite foreseeable harm to vulnerable consumers.

*Third*, class allegations should not be stricken. The proposed class presents common questions regarding Bitcoin Depot's uniform business practices, systematic failure to implement adequate safeguards, and standardized contract terms. Individual damages calculations do not defeat predominance where core liability issues can be resolved through common proof.

Bitcoin Depot operates a business model that systematically facilitates fraud against vulnerable elderly consumers while using unconscionable contract terms to shield itself from liability and guarantee profits from criminal activity. This Court should reject Defendants' attempts to avoid accountability and allow this case to proceed to discovery and proper class certification briefing.

## II.    FACTUAL BACKGROUND

Bitcoin Depot operates with full knowledge that its ATM network systematically facilitates fraud targeting elderly consumers. In September 2023, the company admitted in SEC filings that its services "may be exploited to facilitate illegal activity such as fraud" and that its "risk management policies...may not be sufficient." Compl. ¶¶ 34-35. Despite this knowledge, Bitcoin Depot published articles acknowledging that "seniors are particularly vulnerable" to cryptocurrency scams because they "may be more trusting of strangers and less familiar with how cryptocurrency works." Compl. 36.

Federal data confirms this epidemic: fraud losses at Bitcoin ATMs increased nearly tenfold from 2020 to 2023, with elderly adults accounting for over two-thirds of reported losses. Compl. 25. The Federal Trade Commission specifically warns that Bitcoin ATMs serve as "a payment portal for scammers" due to their speed, anonymity, and irreversibility. Compl. 31.

On December 16, 2024, 66-year-old retiree Steve Beckett fell victim to a sophisticated impersonation scam designed to create maximum psychological distress. Criminals claiming to

3

be Microsoft representatives gained his trust, then escalated their psychological manipulation by falsely claiming his computer showed evidence of illegal pornography purchases and unauthorized credit card transactions. Compl. ¶¶ 70-72. The scammers deliberately created panic by threatening legal consequences and claiming law enforcement involvement, instructing Plaintiff to "secure" his funds through Bitcoin deposits to resolve the fabricated criminal activity. Compl. 73. While under active psychological manipulation and following real-time telephone instructions, Plaintiff arrived at Bitcoin Depot's ATM and was forced to navigate contractual terms on a small screen while believing he was preventing his own arrest. Compl. ¶¶ 74-75. These circumstances render any purported agreement invalid due to extreme duress and lack of meaningful consent.

Despite implementing warnings about elderly vulnerability and government impersonation scams, Bitcoin Depot's systems processed Plaintiff's transactions without intervention:

    a. First Transaction (December 16, 2:20 PM): A 66-year-old first-time user deposited $1,000 while visibly following telephone instructions from scammers claiming to be Microsoft and law enforcement. Compl. 75.

    b. Second Transaction (15 minutes later): The same elderly customer immediately deposited another $3,000 to the identical wallet address, indicating third-party control rather than personal use. Compl. 76.

    c. Third Transaction (December 17): Within 24 hours, Plaintiff returned for a third large transaction of $3,000, creating a pattern of repeated maximum-value deposits that Bitcoin Depot's own educational materials identify as scam indicators. Compl. 77.

4

Rather than protecting vulnerable consumers, Bitcoin Depot's business model depends on high transaction volume, including fraudulent transactions. The company retained approximately $2,000 in fees from Plaintiff's $7,000 in deposits before transferring the remainder to scammers' wallets. Compl. ¶ 81. When Plaintiff discovered the fraud and filed a police report, Bitcoin Depot refused assistance and retained the fees derived from criminal activity. Compl. ¶¶ 83-84.

Bitcoin Depot voluntarily assumed enhanced protective duties by publicly representing that it employs "various measures to protect customers from scams and fraud" and provides "safe and secure Bitcoin ATM services." Compl. ¶ 57. The company published extensive educational content acknowledging elderly vulnerability and promising customer protection that goes beyond mere legal compliance. Compl. ¶¶ 59-60. These voluntary undertakings created reasonable consumer expectations that Bitcoin Depot would exercise reasonable care to detect obvious scam scenarios involving elderly customers making large sequential deposits while following telephone instructions from government impersonators. Compl. ¶¶ 61-65.

Plaintiff's experience reflects a systematic pattern affecting a clearly defined class of victims who used Bitcoin Depot ATMs for impersonation scams and either reported the fraud or conducted transactions under circumstances providing Bitcoin Depot with notice of fraudulent activity. Compl. ¶ 103. The common elements include Bitcoin Depot's knowledge of scam risks, inadequate safeguards despite safety promises, unconscionable contract formation under duress, retention of transaction fees from fraudulent activity, and refusal to provide relief to victims. Compl. ¶ 88.

## III.    LAW AND ARGUMENT

### A.  THIS COURT SHOULD NOT COMPEL ARBITRATION

#### 1.  Legal Standard

5

The Federal Arbitration Act reflects a strong federal policy favoring arbitration agreements and requires courts to place arbitration agreements "on an equal footing with other contracts." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). Under the FAA, a written agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

A party seeking to compel arbitration must show a valid agreement to arbitrate exists, the dispute falls within the scope of the arbitration agreement, and the opposing party refuses to proceed to arbitration. *Druco Rests., Inc. v. Steak N Shake Enters., Inc.*, 765 F.3d 776, 781 (7th Cir. 2014). Whether a valid arbitration agreement exists is determined by state contract law principles. *Coleman v. Coinbase, Inc.*, 2025 U.S. Dist. LEXIS 151871, at 5 (S.D. Ind. Aug. 7, 2025). Under Indiana law, a contract requires offer, acceptance, and consideration.

If the parties have clearly and unmistakably delegated questions of arbitrability to the arbitrator, then threshold questions about the validity, scope, or enforceability of the arbitration agreement must be decided by the arbitrator, not the court. *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010).

## 2. The Court, Not an Arbitrator, Must Decide the Validity of the Purported Arbitration Agreement

Before addressing the merits of any arbitration clause, this Court must first determine whether Bitcoin Depot's Terms and Conditions "clearly and unmistakably" delegate questions of arbitrability to an arbitrator. They do not. Under controlling Supreme Court and Seventh Circuit precedent, delegation of arbitrability requires express language that unmistakably provides that the arbitrator—not the court—will decide threshold questions such as the existence, scope, or

validity of the arbitration agreement. *Rent-A-Center,* 561 U.S. at 70; *Coleman*, 2025 U.S. Dist. LEXIS 151871, at 9–11.

Bitcoin Depot's Terms and Conditions contain no express delegation clause. Declaration of Phillip Brown in Support of Defendant's Motion to Compel Arbitration  and Stay or Dismiss the Action or in the Alternative to Dismiss and Strike Class Allegations ("Brown Decl.")   6(a) and(b), Ex. E (Bitcoin Depot's Terms and Conditions).[1]  The arbitration provision states only that "the parties hereby agree to arbitrate all claims that may arise under the Agreement" and that disputes will be submitted "for resolution by arbitration before the American Arbitration Association ('AAA') in Atlanta, GA, in accordance with the then current Commercial Arbitration rules of the AAA." *Id*. The Terms contain no language stating that the arbitrator will decide gateway issues of arbitrability, such as whether the arbitration agreement is valid, enforceable, or applies to a particular dispute.

While the Terms reference AAA Commercial Rules, which do provide that arbitrators may rule on their own jurisdiction, courts are divided on whether mere incorporation of AAA rules constitutes "clear and unmistakable" delegation, particularly in consumer contracts of adhesion. *Ajamian v. CantorCO2e, L.P.*, 203 Cal. App. 4th 771, 790 (2012) (holding incorporation of AAA rules insufficient for unsophisticated parties absent specific delegation language). The Terms never mention "arbitrability," "gateway issues," or delegation of threshold determinations to the arbitrator. Even if incorporation of AAA rules could theoretically support delegation in some contexts, the circumstances here demonstrate no clear and unmistakable delegation occurred.

---

[1] *See also*, https://bitcoindepot.com/terms-and-conditions/ (last visited September 12, 2025).

Unlike sophisticated online transactions, like that which occurred in *Coleman v. Coinbase*, Plaintiff's assent occurred under fundamentally different circumstances. Plaintiff was under active psychological manipulation by criminals who had convinced him he faced arrest for fabricated crimes. Compl. ¶¶ 73, 75. While scammers provided real-time instructions, Plaintiff navigated the ATM interface believing he was preventing his own prosecution. This extreme duress prevented any meaningful understanding of contractual terms, much less sophisticated concepts like delegation of arbitrability.

Plaintiff is a 66-year-old retiree with limited cryptocurrency experience who was specifically targeted due to his vulnerability. Compl. ¶¶ 2, 8, 69. The Terms appeared in dense, non-negotiable format with no explanation of arbitration provisions. Bitcoin Depot's own materials acknowledge that "seniors are particularly vulnerable" to cryptocurrency scams because they "may be more trusting of strangers and less familiar with how cryptocurrency works." Compl.   36.

Because Bitcoin Depot's Terms do not clearly and unmistakably delegate questions of arbitrability to an arbitrator, this Court must determine whether a valid arbitration agreement exists.

### 3.   The Arbitration Clause is Unenforceable Due to Unconscionability

A contract is unenforceable if it is unconscionable. To be unconscionable, a contract "must be such as no sensible man not under delusion, duress or in distress would make, and such as no honest and fair man would accept." *Precision Homes of Ind., Inc. v. Pickford*, 844 N.E.2d 126, 132 (Ind. Ct. App. 2006) (quoting *Progressive Constr. & Eng'g Co. v. Ind. & Mich. Elec. Co.*, 533 N.E.2d 1279, 1286 (Ind. Ct. App. 1989)). Under Indiana law, unconscionability involves both substantive and procedural elements.

8

### a)  Substantive Unconscionability

Bitcoin Depot's Terms create an unconscionable system that immunizes the company from liability while ensuring it profits from every transaction—including those it knows are fraudulent. Compl. ¶¶ 24, 81, 89-98. The agreement requires individual arbitration in Atlanta, Georgia, bars class actions, and limits Bitcoin Depot's liability to "THE FEES PAID BY YOU TO BITCOIN DEPOT (IF ANY) DURING THE SIX (6) MONTHS IMMEDIATELY PRECEDING THE DATE OF ANY CLAIM." See Brown Decl.   6(a)–(b), Ex. E. In practical terms, this means Bitcoin Depot's maximum liability for facilitating a $7,000 scam is the $2,000 in fees it retained from that very transaction.

Moreover, the Terms declare that "ALL FEE PAYMENTS ARE FINAL AND NON-REFUNDABLE," meaning even the limited liability described above is illusory. *Id*. Bitcoin Depot can retain its fees regardless of its own misconduct, creating a system where the company profits from criminal activity without consequence.

The class action waiver, combined with individual arbitration requirements, prevents consumers from vindicating their rights where individual recovery amounts are small compared to arbitration costs. This is particularly unconscionable given Bitcoin Depot's systematic targeting of elderly consumers who lose thousands of dollars in transactions where Bitcoin Depot might only retain hundreds in fees. Compl. ¶¶ 25, 27, 36, 81. The cost of individual arbitration in Atlanta would often exceed any potential recovery.

Bitcoin Depot also reserves the right to amend the agreement "in our sole discretion, without specific notice to you," allowing the company to change the rules whenever convenient while binding consumers to whatever terms Bitcoin Depot chooses to impose. Brown Decl. 6(a)–(b), Ex. E. The Terms further require that "any legal action against any Covered Parties

must be instituted within one (1) year of the date any claim or cause of action arises," artificially

shortening the time consumers have to discover and pursue legitimate claims. *Id*.

The cumulative effect contravenes fundamental public policy by allowing a party to

contract away liability for intentional misconduct and statutory violations, creating economic

incentives for facilitating criminal activity, and denying meaningful access to judicial remedies

for vulnerable consumers. Compl. ¶¶ 54, 98, 101.

### b) Procedural Unconscionability

The process by which Plaintiff was required to assent to these terms is fundamentally

unfair. Bitcoin Depot's Terms are presented at the ATM as a "take-it-or-leave-it" proposition with

no opportunity for negotiation or meaningful review. See e.g., *Weaver v. American Oil Co*., 276

N.E.2d 144, 146 (Ind. 1971); *NEC Technologies, Inc. v. Nelson*, 478 S.E.2d 769, 771 (Ga. 1996).

The Terms appear during the transaction process, after users have already invested time and

effort and are under pressure to complete the transaction. In scam scenarios—such as Plaintiff

Beckett's—users are under real-time duress, following instructions from criminals, and operating

in states of confusion, fear, and urgency. Compl. ¶¶ 73, 75, 78. This context transforms what

Bitcoin Depot characterizes as "consent" into coerced submission to one-sided terms.

The Terms and Conditions are displayed on a small ATM screen in dense legalese, with

critical provisions—including the arbitration clause, class action waiver, liability limitations, and

non-refundable fee terms—buried within lengthy text. Users must scroll through this material

while standing in public locations such as convenience stores or gas stations, often with others

waiting in line, creating pressure to proceed quickly.

The agreement provides no highlighting, summarization, or plain-language explanation

of its most consequential provisions. The average consumer, especially one in a stressful

10

situation, cannot be expected to read, comprehend, or appreciate the significance of complex arbitration and liability waiver provisions in the brief moment they are presented.

Bitcoin Depot's contract formation process systematically exploits vulnerable populations. The company's own publications acknowledge that seniors are "particularly vulnerable" to cryptocurrency scams, yet Bitcoin Depot does nothing to ensure that elderly or distressed users can understand or meaningfully assent to its terms. Compl. 36.

Plaintiff's experience illustrates this unconscionable process. As a 66-year-old retiree under active psychological manipulation by criminals, Plaintiff was required to navigate Bitcoin Depot's Terms on a small ATM screen. Compl. ¶¶ 73, 75. The scammers provided real-time instructions while Plaintiff believed he was preventing his own prosecution, creating a state of extreme duress that precluded any meaningful contract review. Compl. ¶¶ 75, 78. Under these circumstances—operating under criminal manipulation, panicked about fabricated charges, and focused on following scammer instructions—any purported assent to arbitration and liability waiver provisions was neither knowing, voluntary, nor meaningful. See *Weaver*, 276 N.E.2d at 146 (finding unconscionability where "the party with superior bargaining power has taken advantage of the other party's lack of meaningful choice").

The arbitration agreement and related terms are unconscionable and unenforceable under Indiana law.

### B.  COURT SHOULD NOT DISMISS PLAINTIFF'S COMPLAINT

#### 1.  Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Wertymer v. Walmart, Inc*., 142 F.4th 491, 495 (7th Cir. 2025). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully" but does not require a probability showing. *Iqbal*, 556 U.S. at 678.

### 2. Plaintiff's Claim Under the Indiana Deceptive Consumer Sales Act States a Valid Cause of Action

The Indiana Deceptive Consumer Sales Act ("IDCSA") provides remedies to consumers for practices deemed deceptive in consumer transactions. *McKinney v. State*, 693 N.E.2d 65, 67 (Ind. 1998). The Act's stated purpose is to "protect consumers from suppliers who commit deceptive and unconscionable sales acts" and to "encourage the development of fair consumer sales practices." *Id*. at 69.

An "incurable deceptive act" means "a deceptive act done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead." I.C. § 24-5-0.5-2(7). Intent to defraud or mislead is an essential element of an incurable deceptive act. *McKinney*, 693 N.E.2d at 69. However, the Act defines many deceptive acts using the mental state standard of what the supplier "knows or should reasonably know," which is "plainly a lesser standard than 'knowingly violate' or 'intend to mislead.'" *Id*.

Claims under the IDCSA that are "grounded in fraud" are subject to Indiana Trial Rule 9(B)'s heightened pleading requirements. *McKinney*, 693 N.E.2d at 71-72. Rule 9(B) applies when the "elements of an action for civil penalties under the Act are such that it is grounded in fraud," including claims seeking civil penalties that require showing "knowing" violations or

incurable deceptive acts. *Id*. at 71. However, Rule 9(B) does not apply to all IDCSA claims. For instance, it does not apply to "claims based on allegations that the supplier 'should reasonably know' of the misrepresentations." *Id*. T

While intent to defraud or mislead is generally an essential element of an incurable deceptive act, intent is not required for all deceptive acts under the IDCSA. *McKinney*, 693 N.E.2d at 69. The Act defines many deceptive acts using the mental state standard of what the supplier "knows or should reasonably know," which is "plainly a lesser standard than 'knowingly violate' or 'intend to mislead.'" *Id*.

### a) Plaintiff has Adequately Alleged Incurable Deceptive Acts

Contrary to Defendants' assertions, Plaintiff has sufficiently pleaded incurable deceptive acts under I.C. § 24-5-0.5-2(a)(8). The complaint details this systematic scheme through specific factual allegations. Bitcoin Depot's own SEC filings admit its services "may be exploited to facilitate illegal activity such as fraud," Compl. ℙ 34, yet the company continued marketing its services as "safe and secure" while deliberately choosing minimal safeguards to maximize transaction volume. Compl. ℙℙ 57-58. Bitcoin Depot published articles acknowledging that "seniors are particularly vulnerable" to cryptocurrency scams, Compl. ℙℙ 36-37, yet charges fees up to 50% of transaction amounts while implementing only ineffective warnings that demonstrably fail to prevent scams. Compl. ℙ 5.

Unlike legitimate financial institutions operating under extensive regulatory oversight, Bitcoin Depot specifically markets to vulnerable elderly populations while knowing its systems are routinely exploited for fraud, yet deliberately maintains minimal safeguards to maximize transaction volume and fee retention. Compl. ℙℙ 34, 36-37, 43. The company's business model depends on processing high-volume transactions with limited verification, creating an

environment that facilitates rather than prevents fraudulent activity. Compl. ¶¶ 23, 54-55. The company's practice of retaining fees from transactions it knows are fraudulent while refusing meaningful assistance demonstrates intent to profit from criminal activity targeting vulnerable populations. Compl. ¶¶ 52-55.

Evidence of systematic conduct contrary to known obligations can establish IDCSA liability where defendants "should have known" they were not entitled to engage in the challenged conduct. *Crum v. SN Servicing Corp.*, 2021 U.S. Dist. LEXIS 149949, at 7-8 (S.D. Ind. Aug. 10, 2021). The complaint alleges Bitcoin Depot made false representations about providing "safe and secure Bitcoin ATM services" and employing "various measures to protect customers from scams and fraud" when Bitcoin Depot knew its safeguards were demonstrably ineffective. Compl. ¶¶ 57, 118(a).

### b) The Iowa Supreme Court Decision does not Bar Plaintiff's Claims

The Iowa Supreme Court's analysis in *Bitcoin Depot Operating, LLC v. Carlson* addressed whether Bitcoin Depot had "reason to know" of a particular customer's duress for purposes of contract voidability under Restatement § 175(2). *In re Prop. Seized for Forfeiture from Cason*, 2025 Iowa Sup. LEXIS 58, *5 (Iowa 2025). That analysis is not controlling here for several reasons:

First, the Iowa cases analyzed a different legal standard—"reason to know" of specific duress—rather than the "intent to defraud or mislead" standard required for IDCSA incurable deceptive acts. The Iowa Supreme Court's finding that generalized warnings were insufficient to establish "reason to know" of particular customer duress does not preclude a finding that systematic conduct demonstrates intent to defraud vulnerable populations generally. *Id*. at 5.

14

Second, the Iowa cases addressed contract voidability under the Restatement (Second) of Contracts § 175(2), not consumer protection violations. *Id*. at 5. The Iowa Supreme Court applied the rule that a "contract is voidable by the victim unless the other party to the transaction in good faith and without reason to know of the duress either gives value or relies materially on the transaction." *Id*. Consumer protection statutes like the IDCSA are designed to address patterns of conduct that harm vulnerable consumers, even where individual contracts may remain valid. The complaint here challenges Bitcoin Depot's systematic business practices and false marketing representations, not the validity of individual customer contracts.

Third, unlike the duress analysis in *Carlson*, which focused on Bitcoin Depot's knowledge of one customer's particular circumstances, Plaintiff's IDCSA claim is based on allegations that Bitcoin Depot systematically targets vulnerable elderly consumers while making false representations about security measures it knows are inadequate. Compl. ¶¶ 35-37, 119. The Iowa Supreme Court's analysis that Bitcoin Depot lacked "reason to know" that specific customers were acting under duress does not address whether Bitcoin Depot's broader business practices constitute a "scheme, artifice, or device with intent to defraud or mislead" under I.C. § 24-5-0.5-2(a)(8).

Plaintiff has stated a plausible claim under the IDCSA by alleging specific facts showing Bitcoin Depot engaged in incurable deceptive acts through a systematic scheme to mislead vulnerable consumers about the security of its services while deliberately implementing inadequate safeguards to maximize profits from fraudulent transactions. The complaint satisfies the notice pleading standard and provides sufficient factual allegations to survive a motion to dismiss. Defendants' Motion to dismiss Count I should be denied.

### 3.  Plaintiff States a Valid Claim for Replevin

Under Indiana law, a replevin claim requires that a plaintiff establish "(1) his right to title or right to possession, (2) that the property was unlawfully detained, and (3) that the defendant wrongfully holds possession." *DBS Constr. Inc. v. New Equip. Leasing, Inc*., 2010 U.S. Dist. LEXIS 94680, *5-6 (N.D. Ind. 2010). The plaintiff must show "his right to possession on the strength of his own title, not merely the weakness of the defendant's title or right to possession." *Id*.

### a) Plaintiff has Established a Superior Right to Possession

Plaintiff claims ownership based on equity and the principle that no party may profit from criminal proceeds. When Bitcoin Depot processed transactions it knew or should have known were fraudulent, it became a constructive trustee of the funds obtained through criminal activity. The complaint alleges Plaintiff deposited $7,000 into a Bitcoin Depot ATM as a direct result of criminal extortion, with Bitcoin Depot retaining approximately $2,000 in fees from these fraudulent transactions. Compl. ¶¶ 81, 131.

Once Bitcoin Depot received notice of the fraud, any claimed contractual right to retain those fees became void as a matter of law and public policy. Bitcoin Depot's retention became wrongful when they received actual notice through: (1) Plaintiff's direct contact reporting the fraud, Compl. ℙℙ 83-84; (2) the police report filed by Plaintiff, Compl. ℙ 83; and (3) obvious red flags during the transactions providing constructive notice of fraudulent activity. Compl. ℙ 85; *Schaub v. Estate of Schaub*, 2013 Ind. App. Unpub. LEXIS 798, *9-10 (Ind. Ct. App. 2013) (recognizing that even where possession is not initially wrongful, it can become wrongful based on changed circumstances).

### b) The Fees Constitute Specific, Identifiable Property

The complaint identifies the precise amount of fees retained ($2,000), the specific transaction dates (December 16-17, 2024), and the particular ATM location. Compl. ¶¶ 75-77, 131. These fees are specifically identifiable as proceeds derived from Plaintiff's particular fraudulent transactions, distinguishable from Bitcoin Depot's general operating funds.

Indiana law recognizes that replevin may be used to recover specific sums where they can be traced and identified, particularly where the defendant's right to retain the property is void or voidable. The requirement that property be "specific" is satisfied because the $2,000 represents fees directly traceable to Plaintiff's specific transactions on identified dates.

### c) The Cason Case is Distinguishable and Inapplicable

Defendants' reliance on In re Property Seized for Forfeiture from Cason is misplaced for several critical reasons. First, Cason involved a forfeiture proceeding between competing claimants to seized funds, not a replevin action seeking return of wrongfully retained fees. *In re Prop. Seized for Forfeiture from Cason*, 2025 Iowa Sup. LEXIS 58, *1-2 (Iowa 2025). The Cason court was determining "whether the contract formed between Bitcoin Depot and a customer using its Bitcoin ATM is voidable due to third-party duress," not whether continued retention of fees after notice of fraud constitutes wrongful detention. *Id*.

Second, the property rights analysis in *Cason* is fundamentally different. In *Cason*, the issue was who had superior rights to the customer's own legitimately-obtained cash that was deposited into the ATM. Here, Plaintiff is claiming rights to fees that Bitcoin Depot retained after receiving specific notice that the transactions were fraudulent. Unlike the generalized warnings referenced in *Cason*, Bitcoin Depot had actual notice of fraud in Plaintiff's specific case through direct contact and police reports. Compl. ¶¶ 83-84.

17

Third, *Cason's* holding that "there [was] no evidence in the record . . . that Bitcoin Depot had reason to know" of the customer's particular duress does not apply here, where Bitcoin Depot received explicit notice of the fraudulent nature of Plaintiff's specific transactions. *Cason*, 2025 Iowa Sup. LEXIS 58, at 5.

### d)  The "Non-Refundable" Provision is Unenforceable

Bitcoin Depot's contractual provision declaring all fees "final and non-refundable" cannot insulate the company from liability for retaining proceeds of criminal activity. Such clauses are unconscionable and unenforceable when applied to transactions the company knows are fraudulent. Once Bitcoin Depot was notified that Plaintiff's transactions were the product of criminal extortion, any contractual right to retain fees from those transactions became void. The company cannot hide behind boilerplate contract language to retain proceeds from criminal activity.

### 4.  Plaintiff States a Valid Claim for Negligence

Under Indiana law, negligence claims contain three elements: "(1) duty owed to plaintiff by defendant, (2) breach of duty by allowing conduct to fall below the applicable standard of care, and (3) compensable injury proximately caused by defendant's breach of duty." *Bader v. Johnson*, 732 N.E.2d 1212, 1217 (Ind. 2000). Businesses have the common-law "duty to exercise ordinary and reasonable care in the conduct of their operations . . . for the safety of others whose injuries should reasonably have been foreseen or anticipated." *WEOC, Inc. v. Niebauer*, 226 N.E.3d 771, 778 (Ind. 2024).

### a)  Bitcoin Depot Owed Plaintiff a Duty of Reasonable Care

A duty of care arises from the relationship between parties, foreseeability of harm, and voluntary assumption of protective responsibilities. *Pfenning v. Lineman*, 947 N.E.2d 392, 398

(Ind. 2011). As a business operating financial service kiosks, Bitcoin Depot has a common-law duty to exercise ordinary and reasonable care in its operations for the safety of others whose injuries should reasonably have been foreseen. *WEOC, Inc.*, 226 N.E.3d at 778.

Bitcoin Depot operates a nationwide network of financial service kiosks that it actively markets as "safe and secure" while publicly claiming to employ "various measures to protect customers from scams and fraud." Compl. ¶¶ 57, 59-60. These representations, combined with Bitcoin Depot's actual knowledge of widespread scam exploitation targeting seniors, establish a clear duty to implement reasonable safeguards. Compl. ¶¶ 34-36.

### b) Bitcoin Depot Voluntarily Assumed Enhanced Protective Duties

Bitcoin Depot's extensive marketing materials, educational content, and public commitments to customer protection constitute a voluntary assumption of duty under Indiana law. The company published dedicated webpages warning about scams, created educational materials specifically addressing cryptocurrency fraud targeting elderly consumers, and repeatedly represented that it employs protective measures to safeguard customers. Compl. ¶¶ 57-60.

Indiana courts recognize that a party may voluntarily undertake a duty to act in due care with respect to another. *Mayhue v. Sparkman*, 653 N.E.2d 1384 (Ind. 1995) (approving use of § 323 in medical malpractice case); *Claxton v. Hutton*, 615 N.E.2d 471, 474 (Ind. Ct. App. 1993) ("A duty of care exists when a party assumes such a duty, either gratuitously or voluntarily."); *Lucas v. Dorsey Corp.*, 609 N.E.2d 1191, 1198 (Ind. Ct. App. 1993) (assumption of a duty creates a special relationship between parties and a duty to act as a reasonably prudent person); *Cox v. American Aggregates Corp.*, 580 N.E.2d 679, 685 (Ind. Ct. App. 1991).

19

Under established Indiana precedent, when a party voluntarily undertakes to protect another from harm, it must perform that undertaking with reasonable care. *Pfenning*, 947 N.E.2d at 398 (noting that duty analysis considers the relationship between parties and public policy concerns). Bitcoin Depot cannot escape liability by arguing it had no duty when it actively promoted its protective measures as a competitive advantage and marketing tool designed to induce customer confidence and transactions. Compl. ¶¶ 61-68.

### c) The Economic Loss Doctrine Does Not Bar Plaintiff's Tort Claims

The economic loss doctrine does not bar tort claims where the defendant's conduct is independent of the contract or involves gross negligence. Under Indiana law, the doctrine generally precludes recovery for "purely economic loss" caused by negligence in contract performance. *Indianapolis-Marion Cnty. Pub. Libr. v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 729 (Ind. 2010). However, at the 12(b)(6) stage, application of this rule invites heightened scrutiny and must yield if the plaintiff has set forth circumstances under which it would be entitled to relief. *Residences at Ivy Quad Unit Owners Ass'n v. Ivy Quad Dev.*, 179 N.E.3d 977, 983 (Ind. 2022). When determining whether the economic loss doctrine precludes tort recovery, two considerations guide the analysis: the type of damages sought and the contractual relationship between the parties. *Id.*

Plaintiff's claims arise from Bitcoin Depot's failure to implement reasonable safeguards despite actual knowledge of systematic fraud targeting vulnerable populations, not from mere contractual breach. Compl. ¶¶ 43-55. Plaintiff's tort claims are based on conduct independent of the contract—specifically, Bitcoin Depot's conscious disregard for known risks to vulnerable

20

consumers despite voluntarily assuming protective duties through its marketing and representations. Compl. ¶¶ 52-55, 61-67.

### d) Plaintiff Adequately Alleges Breach of Duty and Causation

The complaint details specific failures by Bitcoin Depot to implement reasonable safeguards despite actual knowledge of fraud patterns and red flags. Despite knowing that elderly customers making large, sequential transactions while following telephone instructions are hallmarks of scam activity, Bitcoin Depot deliberately chose to rely solely on superficial warnings while allowing transactions to proceed without meaningful intervention. Compl. ¶¶ 47-51, 75-77.

Bitcoin Depot's failure to implement reasonable safeguards was a proximate cause of Plaintiff's losses. The harm suffered by an elderly victim following a well-documented scam pattern was entirely foreseeable to Bitcoin Depot, which acknowledges in public filings that its ATMs are routinely exploited for fraud. Compl. ¶¶ 34-35. Plaintiff alleges that reasonable monitoring and intervention protocols would have detected and prevented the fraudulent transactions. Compl. ¶¶ 51, 87, 148.

Defendants' argument that third-party criminal conduct breaks the causal chain ignores well-established Indiana precedent recognizing that defendants can be liable for failing to prevent foreseeable criminal acts when they have assumed duties to protect against such harm. *Pfenning*, 947 N.E.2d at 398 (holding that duty analysis must consider foreseeability of harm). Financial service providers regularly implement safeguards to detect and prevent fraudulent transactions precisely because such criminal activity is foreseeable and preventable through reasonable measures.

### 5. Plaintiff States a Valid Claim for Voluntary Assumption of Duty

Indiana courts recognize the gratuitous assumption of duty by one who, through affirmative conduct or agreement, assumes and undertakes a duty to act. *Griffin v. Simpson*, 948 N.E.2d 354 (Ind. Ct. App. 2011). For an actor to gratuitously assume a duty, the actor must specifically undertake to perform the task he is charged with having performed negligently. *Severson v. Bd. of Trs. of Purdue University,* 777 N.E.2d 1181 (Ind. Ct. App. 2002).

### a) Bitcoin Depot Made Specific Undertakings Beyond Ordinary Business Practices

Bitcoin Depot published extensive educational materials specifically addressing cryptocurrency scam prevention, created a dedicated webpage titled "Protecting Yourself from Bitcoin ATM Scams and Fraud," and repeatedly represented that it employs protective measures as a core service offering. Compl. ¶¶ 57-60. These representations go far beyond typical commercial statements and constitute specific undertakings to perform fraud prevention tasks.

Under Indiana law, three factors frequently accompany an assumption of duty: "(1) where one person is in need of supervision or protection; (2) from someone who is in a superior position to provide it and (3) that person has a right to intervene." *Sports Inc. v. Gilbert*, 431 N.E.2d 534, 538 (Ind. Ct. App. 1982). All three factors are present here. Bitcoin Depot specifically acknowledged that elderly consumers are "particularly vulnerable" to cryptocurrency scams and are in need of protection. Compl.   36. Bitcoin Depot was in a superior position to detect and prevent fraud through transaction monitoring and had the right to intervene through customer verification and refusal to process suspicious transactions.

### b) Bitcoin Depot Increased Plaintiff's Risk of Harm and Breached its Assumed Duties

22

Where there is a failure to act on a gratuitous promise, liability is "confined to situations when the beneficiaries detrimentally relied on performance...*or* when the actor increased the risk of harm." *Ember v. B.F.D., Inc*., 490 N.E.2d 764, 770 (Ind. Ct. App. 1986) (emphasis added). By marketing its services as safe while implementing only superficial protections, Bitcoin Depot increased Plaintiff's risk of harm beyond what would have existed without its undertakings. Compl. ¶¶ 159, 163.

Bitcoin Depot's false safety representations created a veneer of legitimacy that made its ATMs more attractive targets for criminal schemes targeting vulnerable consumers. The company's public commitments to fraud prevention created an appearance of security that criminals could exploit when directing victims to Bitcoin Depot ATMs, knowing that the superficial warnings would be ineffective against their sophisticated psychological manipulation techniques.

Despite its extensive public commitments, Bitcoin Depot failed to exercise reasonable care in protecting customers from foreseeable fraud. The company relied solely on superficial warnings while refusing to implement transaction monitoring, enhanced verification procedures, or intervention protocols for obvious scam scenarios. Compl. ¶¶ 160-161. When presented with clear red flags such as an elderly first-time user making large sequential transactions while following telephone instructions, Bitcoin Depot chose to process the transactions and retain substantial fees rather than intervene to protect a vulnerable customer. This conduct directly breached the protective duties the company voluntarily assumed through its public representations.

### c)  The Claim is Not Improperly Duplicative

While Plaintiff's voluntary assumption of duty claim shares some factual allegations with his negligence claim, the legal theories are distinct and address different sources of duty. The negligence claim is based on general duties arising from the parties' relationship and foreseeability of harm, while the voluntary assumption claim is based specifically on Bitcoin Depot's affirmative undertakings to provide fraud protection services.

Indiana law permits alternative pleading of related but legally distinct theories, particularly where the facts support multiple sources of legal duty. The voluntary assumption claim addresses Bitcoin Depot's specific representations about fraud prevention, while the negligence claim addresses broader duties of reasonable care in operating financial service kiosks.

The voluntary assumption of duty doctrine serves important public policy goals by ensuring that businesses honor the protective commitments they make to induce consumer confidence and transactions. This is particularly important in industries like cryptocurrency services where vulnerable populations are systematically targeted by sophisticated fraud schemes.

### C. CLASS ALLEGATIONS SHOULD NOT BE STRICKEN

#### 1. Legal Standard

Motions to strike class allegations at the pleading stage are "generally disfavored" because class certification typically "involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," making it "generally inappropriate" to strike class allegations before discovery. *Drake v. Mirand Response Sys.*, 2020 U.S. Dist. LEXIS 132010, at *4 (S.D. Ind. July 22, 2020). Courts should grant such motions only where the

24

pleadings are facially and inherently deficient and demonstrate that "no possible set of factual allegations could justify certifying a class." *Id.* at *5.

When defendants attempt to preemptively strike class allegations on the face of the complaint prior to plaintiff's motion for class certification and before any discovery has been conducted, courts must accept allegations supporting class certification as true. *Id.*; *Cox v. Sherman Capital LLC*, 2014 U.S. Dist. LEXIS 43147, *29 (S.D. Ind. March 31, 2014); *Boyce v. Wachovia Sec., LLC*, 2010 WL 1253744, at *1 (E.D.N.C. Feb. 17, 2010); *Sjoblom v. Charter Commc'ns, LLC*, 2007 WL 4560541, at *1 (W.D. Wis. Dec. 19, 2007). Under these circumstances, defendants bear the heavy burden of demonstrating from the face of plaintiff's complaint that "it will be impossible to certify the classes alleged by the plaintiffs regardless of the facts the plaintiffs may be able to prove." *Boyce*, 2010 WL 1253744, at 7.

This demanding standard requires courts to determine whether the complaint is "so facially lacking that no amount of discovery could yield a certifiable class." Drake, 2020 U.S. Dist. LEXIS 132010, at 5. Courts should resolve doubts about class viability in favor of allowing the case to proceed to the class certification stage, where full factual development can occur.

### 2. The Complaint Alleges Common Questions and a Cohesive Class

Plaintiff's class definition is not facially defective and satisfies the Seventh Circuit's requirements for proper class definition. The proposed class consists of persons who completed cash-to-Bitcoin transactions at Bitcoin Depot ATMs in Indiana as part of impersonation scams and who either reported the fraudulent transaction or made such transactions under circumstances that provided Bitcoin Depot with actual or constructive notice of the fraud. Compl.   103.

25

This definition establishes objective criteria that create a cohesive group with shared interests and common legal issues. The class definition is "clearly" defined "based on objective criteria," as required by the Seventh Circuit. *Mullins v. Direct Dig., Ltd. Liab. Co.*, 795 F.3d 654, 659 (7th Cir. 2015) (cited in *Drake*, 2020 U.S. Dist. LEXIS 132010 at 8). The class identifies "particular groups of individuals harmed in particular ways during a particular period of time" and is "not defined using subjective criteria" or as a "fail-safe class." *Drake*, 2020 U.S. Dist. LEXIS 132010 at 9.

The complaint alleges numerous common questions of law and fact that are central to all class members and can be resolved on a class-wide basis. These include whether Bitcoin Depot misrepresented the security of its services and failed to implement adequate safeguards, whether Bitcoin Depot's business practices constitute incurable deceptive acts under the IDCSA, whether Bitcoin Depot wrongfully retained fees from fraudulent transactions, whether Bitcoin Depot's conduct was negligent or reckless, and whether Bitcoin Depot voluntarily assumed duties to protect customers from scams. Compl.  107.

The complaint alleges a systematic course of conduct by Bitcoin Depot involving uniform misrepresentations about security, uniform failure to implement adequate safeguards despite knowledge of widespread fraud, and uniform retention of fees from scam victims while refusing meaningful assistance. Compl. ¶¶ 43, 47-51, 53, 57-58, 60, 84, 91-96. The existence and adequacy of Bitcoin Depot's safeguards, its knowledge of scam patterns targeting elderly consumers, and its policies regarding refunds and customer protection are all common issues that can be resolved through class-wide proof.

Any individualized damages calculations or factual variations can be managed through subclasses, sampling, or other procedural mechanisms routinely employed in consumer class

actions. See e.g., *Johnson v. Navient Solutions, Inc.*, 315 F.R.D. 501, 503 (S.D. Ind. 2016). The core liability questions regarding Bitcoin Depot's knowledge, policies, and systematic failures are common and predominate over any individualized issues.

Moreover, class certification decisions should be made on a full factual record after discovery. *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014). Plaintiff is entitled to discovery regarding Bitcoin Depot's internal policies, transaction monitoring systems, customer demographics, knowledge of scam patterns, and responses to fraud reports before the Court can properly evaluate whether class certification requirements are satisfied. Defendants' motion to strike class allegations is premature and unsupported. The Court should deny Defendants' motion to strike and permit the case to proceed to discovery and proper class certification briefing.

## IV.   CONCLUSION

Bitcoin Depot operates a business model that systematically exploits vulnerable elderly consumers while using unconscionable contract terms to shield itself from liability. The company admits in SEC filings that its services "may be exploited to facilitate illegal activity such as fraud," yet deliberately maintains minimal safeguards to maximize transaction volume and fee retention from the very criminal activity it acknowledges.

Plaintiff Steve Beckett's experience exemplifies this exploitation: a 66-year-old retiree manipulated by criminals into depositing $7,000 while Bitcoin Depot processed obvious scam transactions and retained $2,000 in fees. When Plaintiff reported the fraud, Bitcoin Depot refused assistance and kept the proceeds from criminal activity.

This Court should reject Defendants' attempts to compel arbitration based on an unconscionable agreement formed under extreme duress. The complaint states valid claims under the IDCSA for systematic deceptive practices, replevin for wrongfully retained criminal

proceeds, and tort claims based on Bitcoin Depot's voluntary assumption of protective duties it failed to honor. The proposed class presents common questions suitable for class treatment regarding Bitcoin Depot's uniform business practices and systematic failures.

For these reasons, Plaintiff respectfully requests that the Court deny Defendants' motion in its entirety and allow this case to proceed to discovery and proper class certification briefing.

Respectfully submitted,

**DANNLAW**

/s/Brian D. Flick_____
Brian D. Flick (OH #0081605)
Marita I. Ramirez (OH #0110882)*
*Admitted Pro Hac Vice
DannLaw
15000 Madison Avenue
Lakewood, OH 44107
Phone: 216-373-0539
Fax: 216-373-0536
notices@dannlaw.com
*Counsel for Plaintiff Steven Beckett
and the putative class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 17, 2025, a true and correct copy of the foregoing *Response in Opposition to Defendants Motion to Compel Arbitration and Stay or Dismiss the Action or in the Alternative to Dismiss and Strike Class Allegations* was filed and served with the Clerk of Courts via electronic filing pursuant to District of Indiana ECF procedures and served upon the following parties:

Nicole Narotzky at nicole.narotzky@gtlaw.com
GREENBERG TRAURIG, LLP
90 S. 7th St., Suite 3500
Minneapolis, MN 55402

Jena Valdetero at jena.valdetero@gtlaw.com
GREENBERG TRAURIG, LLP
360 N Green St. Suite 1300
Chicago IL, 60607
jena.valdetero@gtlaw.com

*Counsel for Defendants*
*Bitcoin Depot, Inc.,*
*Bitcoin Depot Operating,*
*LLC d/b/a/ Bitcoin Depot*

/s/ Brian D. Flick
Brian D. Flick (OH #0081605)
Marita I. Ramirez (OH #110882)*
*Admitted Pro Hac Vice
DannLaw

*Counsel for Plaintiff*