UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| STEVE BECKETT individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:25-cv-01450-TWP-MG ) |
| BITCOIN DEPOT, INC., BITCOIN DEPOT OPERATING, LLC d/b/a BITCOIN DEPOT, | ) ) ) ) |
| Defendants. | ) ) |

**ORDER ON DEFENDANTS' MOTION TO COMPEL ARBITRATION**

This matter is before the Court on a Motion to Compel Arbitration and Stay or Dismiss the Action or in the Alternative to Dismiss and Strike Class Allegations (Filing No. 21) filed by Defendants Bitcoin Depot, Inc., and Bitcoin Depot Operating, LLC d/b/a Bitcoin Depot (together, "Bitcoin"). Plaintiff Steve Beckett ("Beckett") initiated this action on behalf of himself and all others similarly situated against Bitcoin alleging causes of action for: Count I: Violation of Indiana Deceptive Consumer Sales Act, Ind. Code §§ 24-5-0.5-4(a) and (i); Count II: Replevin; Count III: Negligence/Gross Negligence/Recklessness; and Count IV: Voluntary Assumption of a Duty (Filing No. 1). Oral argument on the Motion was heard on December 16, 2025. For the reasons explained in this Order, the Court **grants** the Motion to Compel Arbitration and to **stay** this action; and **denies** the alternative requests to dismiss and strike class allegations.

I. BACKGROUND

On December 16, 2024, Beckett, a 66-year-old retired professional, received a fraudulent computer message claiming that his screen was locked and directing him to call Microsoft for assistance (Filing No. 1 at 18). Beckett followed the instructions, contacted the provided number,

and spoke with an individual claiming to be a representative from Microsoft. *Id.* This individual is now understood to have been a scammer.

Beckett granted the scammer remote access to his computer believing he was receiving legitimate technical support. *Id.* The scammer told Beckett that his computer and accounts had been compromised to purchase illegal pornography, including child pornography, and to make unauthorized purchases with multiple credit and debit cards. *Id.* at 19. The scammer convinced Beckett that law enforcement was involved and that his financial accounts were at risk. *Id.* Beckett was instructed to withdraw cash and deposit it into Bitcoin ATMs to "secure" his funds and resolve the alleged criminal activity. *Id.*

That same day, Beckett withdrew $4,000.00 from his bank at 2:20 p.m., and deposited $1,000.00 into a Bitcoin ATM. Fifteen minutes later, at 2:35 p.m., Beckett deposited another $3,000.00 into the same Bitcoin ATM. *Id.*

The next day, December 17, 2024, Beckett withdrew an additional $3,100.00 from his bank account and returned to the same Bitcoin ATM, depositing $3,000.00 at 2:35 p.m. *Id.* at 20. After this third transaction, Beckett noticed the fraud warnings associated with his Bitcoin ATM usage, and he started to question whether something might be wrong with the situation. *Id.* When the scammer instructed him to empty out his IRA accounts for an additional deposit, Beckett's suspicions were heightened. He discussed the situation with his wife. *Id.*

Prior to completing each of the transactions, Beckett had to agree to Bitcoin's Terms and Conditions ("Terms and Conditions" or "Agreement"), which provide:

> The parties hereby agree to arbitrate all claims that may arise under the Agreement. Without limiting the foregoing, should a dispute arise between the parties (including the Covered Parties) including, without limitation, any matter concerning the Bitcoin Depot Offerings, the terms and conditions of the Agreement or the breach of the same by any party hereto: (a) the parties agree to submit for resolution by arbitration before the American Arbitration Association ("AAA") in

2

> Atlanta, GA, in accordance with the current Commercial Arbitration rules of the AAA.

(Filing No. 24-1 at 19–20 ¶ 17.1). The Terms and Conditions also provide:

> THE AGREEMENT CONTAINS DISCLAIMERS OF WARRANTIES, LIMITATIONS OF LIABILITY, RELEASES, A CLASS-ACTION WAIVER, AND THE REQUIREMENT TO ARBITRATE ANY AND ALL CLAIMS THAT MAY ARISE HEREUNDER AGAINST BITCOIN DEPOT, AS WELL AS ITS PARENT, SUBSIDIARIES, RELATED PARTIES, THIRD-PARTY SERVICE PROVIDERS AND MARKETING PARTNERS (COLLECTIVELY, "COVERED PARTIES"), WHO ARE EXPRESS THIRD-PARTY BENEFICIARIES OF THE MANDATORY ARBITRATION PROVISION. THE AFOREMENTIONED PROVISIONS ARE AN ESSENTIAL BASIS OF THE AGREEMENT.

*Id.* at 2.

To engage in each transaction, Beckett had to verify his telephone number through the Bitcoin ATM with the screen, which states in red text, "If someone else sent you to this machine and provided you with a QR Code or wallet ID to send funds to, it is most likely a scam." (Filing No. 24-4 at 4). Beckett was then asked to create and verify a secret PIN. *Id.* at 5.

Beckett was then sent a text message, which read, "Warning! Don't use Depot's ATM for payments to any govt [*sic*] entities, law enforcement, employers, tech support companies, and significant others, as it's likely a scam. Don't use a QR code provided by a 3rd party. Need help? Call 678-435-9604." *Id.* With each transaction, Beckett had to enter his identifying information.

Next, before any transaction could be completed, another screen popped up, which included a warning:

> ARE YOU BEING SCAMMED? Do not buy bitcoin for IRS payments, if someone says you have been hacked or are being investigated, or if someone is trying to access your computer or bank account. These are scams!
> WARNING: LOSSES DUE TO FRAUDULENT OR ACCIDENTAL TRANSACTIONS MAY NOT BE RECOVERABLE AND TRANSACTIONS IN VIRTUAL CURRENCY ARE IRREVERSIBLE.

3

*Id.* at 11. Beckett accepted the Terms and Conditions and proceeded past the above warning screens for each of the three transactions.

In addition, to complete a transaction, a user must scan a QR code that contains a link to a Bitcoin wallet. The user is then given another prompt stating: "Does this wallet belong to you?" There are two options provided: "No, it's someone else's"; and "Yes, it's mine." *Id.* at 12. If the user selects "No, it's someone else's," then the user is directed to a prompt that states "WARNING" in red letters and:

> Bitcoin Depot terms of service require all users to use Bitcoin wallets that they own. You selected that you do not own the wallet you are attempting to use.
>
> Never scan a QR code that has been provided to you from a 3rd party. Remember Bitcoin transactions are final and irreversible. QR codes provided to you by government entities including the IRS, law enforcement, employers, technical support companies, someone saying you've been hacked and significant other could be scams.
>
> Please contact Bitcoin Depot customer support if you have questions about scams: (678) 435-9604.
>
> In order to proceed you will need to create your own Bitcoin wallet and provide the Bitcoin wallet address QR code from that wallet.

*Id.* If the user says they are using someone else's wallet, the transaction is cancelled, and they must start over and download their own wallet. *Id.* During the three transactions, Beckett confirmed that the Bitcoin wallet to which he was transferring the Bitcoin was his own (Filing No. 23 at 5).

After Beckett discussed the matter with his wife, they went to the Bitcoin ATM, examined it, and called Bitcoin's customer service to report the suspected fraud (Filing No. 1 at 20). The Bitcoin representative confirmed that it was likely fraud and told Beckett that there was no way to get his money back. *Id.*

All transactions facilitated via Bitcoin ATMs come with a service fee, which in this case totaled approximately $2,000.00. *Id.* Beckett filed a police report and contacted Bitcoin seeking

4

assistance and recovery of the funds. *Id.* at 21. However, Bitcoin retained possession of the approximately $2,000.00, stating that transactions are irreversible.

On July 21, 2025, Beckett filed this action (Filing No. 1).

## II. LEGAL STANDARD

In 1925, Congress enacted the Federal Arbitration Act ("FAA") in response to "widespread judicial hostility to arbitration." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 232 (2013). Section 2 of the FAA provides:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. Thus, arbitration is a matter of contract. *Am. Exp.*, 570 U.S. at 233. Consistent with this principle, courts must place arbitration agreements "on an equal footing with other contracts and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citation omitted).

A party seeking to compel arbitration must show (1) a valid agreement to arbitrate, (2) the dispute is within the scope of arbitration, and (3) the opposing party refuses to proceed to arbitration. *Kass v. PayPal Inc.*, 75 F.4th 693, 700 (7th Cir. 2023). Arbitration can only be compelled when the court is "satisfied that the parties agreed to arbitrate *that dispute*." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) (emphasis in original); *United Nat. Foods, Inc. v. Teamsters Loc. 414*, 58 F.4th 927, 933 (7th Cir. 2023). Whether a valid arbitration agreement exists is a matter of state contract law. *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 733 (7th Cir. 2002).

"One way to assent to and form a contract online is for a customer to click on an 'I Accept' button as part of a 'clickwrap' agreement. Courts around the country have recognized that this type

5

of electronic 'click' can suffice to signify the acceptance of a contract." *Domer v. Menard, Inc.*, 116 F.4th 686, 694 (7th Cir. 2024) (citations and internal quotation marks omitted). A court may consider challenges to the arbitration clause itself, but any challenge to the contract as a whole should only be resolved by an arbitrator. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445−46 (2006) ("[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance.").

If the moving party establishes that there is a valid arbitration agreement, the FAA provides a strong presumption that arbitration "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs., Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 650 (1986) (internal quotations omitted). Any doubt concerning the arbitration "should be resolved in favor of coverage." *Id.* This presumption is especially applicable when the arbitration clause is broad. *See id.* Only the "most forceful evidence" to exclude a claim from arbitration will prevail. *Id.*

A motion to compel arbitration is decided according to the standard used to resolve summary judgment motions pursuant to Federal Rule of Civil Procedure 56. *Tinder*, 305 F.3d at 735. "Just as in summary judgment proceedings, a party cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." *Id.* (citing *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995)).

### III.  DISCUSSION

Bitcoin argues that all three elements necessary to compel arbitration under the FAA are met (Filing No. 22 at 9). Beckett argues that before addressing the merits of any arbitration clause, the Court must first determine whether Bitcoin's Terms and Conditions "clearly and unmistakably"

delegate questions of arbitrability to an arbitrator (Filing No. 26 at 8). He also contends the arbitration clause is unenforceable due to unconscionability. *Id.* The Court will first address whether the three elements necessary to compel arbitration exist, before turning to Beckett's contentions.

Bitcoin argues the first prong is satisfied because there is a written agreement to arbitrate, which is all that is necessary for the first prong. *Id.* (citing *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 690 (7th Cir. 2005)). The Court agrees. The first prong is satisfied because there is a written agreement to arbitrate assented to by both parties. *See Zurich*, 417 F.3d at 690. Beckett does not contest that he assented to the arbitration agreement on three separate occasions when he agreed to Bitcoin's Terms and Conditions, which provide that the parties agree to arbitrate all claims which may arise under the agreement (Filing No. 24-1 at 19–20 ¶ 17.1). He clearly did on three separate occasions.

Concerning the second prong, Bitcoin argues that Beckett's claims fall squarely within the arbitration provision because the Terms and Conditions expressly state that "[t]he parties hereby agree to arbitrate all claims that may arise under the Agreement." *Id.* at 19–20. Bitcoin points out that the Seventh Circuit has held that "any dispute between contracting parties that is in any way connected with their contract could be said to 'arise out of' their agreement and thus be subject to arbitration under a provision employing this language." (Filing No. 22 at 9 (quoting *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 642 (7th Cir. 1993))).

Bitcoin also cites to *Mooneyham v. Bitcoin Depot, Inc.*, a District of South Carolina case dealing with the same arbitration provision in a similar factual circumstance. *Id.* at 10 (citing *Mooneyham v. Bitcoin Depot, Inc.*, No. 24-cv-01774, 2025 U.S. Dist. LEXIS 35477 (D.S.C. Feb. 27, 2025)). Mooneyham, a 73-year-old woman, was the target and victim of a cryptocurrency ATM

7

scam. Imposters claiming to be her bank and the Federal Trade Commission called her and instructed her to withdraw money from her bank account and deposit it into a Bitcoin Depot ATM to protect her money. Upon initiating transactions with the ATM, the machine displayed numerous informational prompts to the user, requiring the user to read and accept the prompts to complete a transaction at the ATM. To continue her transactions while using the ATM on two occasions, Mooneyham selected "I accept these terms and conditions," which included mandatory arbitration. Mooneyham argued that she was incapable of exercising free will to voluntarily assent because she was under duress as an elderly consumer. The district court found that all claims asserted in Mooneyham's putative class action fell within the scope of the broad arbitration provision, and rejected her arguments regarding contract formation and duress, holding that such defenses must be decided by the arbitrator. *Id.* at *4–5. Bitcoin argues that *Mooneyham* provides persuasive, recent authority that supports compelling arbitration and staying or dismissing this action.

Although *Mooneyham* is not binding, the Court agrees that it is persuasive in determining that the dispute here is within the scope of arbitration. Beckett's claims—Violation of Indiana Deceptive Consumer Sales Act, Replevin, Negligence/Gross Negligence/Recklessness, and Voluntary Assumption of a Duty—clearly arise out of the agreement, as each of these claims surround the transactions that took place, and the arbitration agreement specifically uses the phrase "all claims that may arise under" the arbitration agreement to determine the scope.

Finally, Bitcoin argues that the third prong—that Beckett refuses to proceed to arbitration—is clearly satisfied because "a plaintiff refuses to proceed to arbitration where they (1) have filed a lawsuit and (2) opposed the defendant's motion to compel arbitration." (Filing No. 22 at 11 (citing *Extremely Clean Cleaning Servs., LLC v. CAAT, Inc.*, No. 18-cv-02968, 2019 U.S. Dist. LEXIS 30149, at *7 (S.D. Ind. Feb. 25, 2019) ("Plaintiffs have demonstrated their refusal to

8

submit to arbitration by filing this lawsuit and by their opposition to [d]efendants' motions to stay.'))). Here, Beckett has refused to submit to arbitration by filing this lawsuit and opposing the instant motion.

Accordingly, the Court concludes that all three elements required for compelling arbitration have been met, and unless the Court is persuaded by Beckett's contentions that he should not be compelled to arbitrate on other grounds, the Court will enforce the arbitration agreement contained in the Terms and Conditions.

Beckett argues that the Court should not compel arbitration for two reasons: (1) the Court, not an arbitrator, must decide the validity of the purported arbitration agreement because the Terms and Conditions language does not "clearly and unmistakably" delegate questions of arbitration to the arbitrator; and (2) the arbitration clause is unenforceable due to unconscionability (Filing No. 26 at 6–11).

### A. Delegation of Arbitrability

Beckett argues that the Terms and Conditions do not contain an express delegation clause and merely state that "the parties hereby agree to arbitrate all claims that may arise under the Agreement." *Id.* at 7. However, the Agreement also states that disputes will be submitted "for resolution by arbitration before the American Arbitration Association ('AAA') in Atlanta, GA, in accordance with the then current Commercial Arbitration rules of the AAA." *Id.*

Beckett acknowledges that the Terms and Conditions reference the AAA Commercial Rules—which provide that arbitrators may rule on their own jurisdiction—but argues that courts are divided on whether mere incorporation of AAA rules constitutes "clear and unmistakable" delegation, particularly in consumer contracts of adhesion. *Id.* (citing *Ajamian v. CantorCO2e,*

9

*L.P.*, 137 Cal. Rptr. 3d 773, 789 (Cal. Ct. App. 2012) (holding incorporation of the AAA rules insufficient for unsophisticated parties absent specific delegation language)).

Here, it is undisputed that the arbitration clause incorporated the AAA Commercial Arbitration rules. *See Dunston v. R. G. Love Galleries, Inc.*, No. 07 CV 5113, 2008 U.S. Dist. LEXIS 44118, at *8 (N.D. Ill. June 4, 2008) ("[W]here the parties agree to arbitration pursuant to the rules of the [AAA], the parties incorporate the AAA's rules into the arbitration agreement."). Rule 7(a) of the AAA Commercial Arbitration rules explicitly grants to the arbitrator "the power to rule on his or her jurisdiction." *Gilman v. Walters*, 61 F. Supp. 3d 794, 800 (S.D. Ind. 2014). Many district courts within the Seventh Circuit and sister circuit courts have held that by incorporating the AAA rules into their agreements, parties evidence a "clear and unmistakable" intent to allow the arbitrator to decide the question of arbitrability. *See id.* (citing cases).

The Court understands Beckett's argument—that, as the California state court held in *Ajamian*, unsophisticated individuals are unlikely to understand that the incorporation of the AAA rules means an arbitrator will determine arbitrability rather than the courts, 137 Cal. Rptr. 3d at 789—however, the majority of courts have reached the opposite conclusion. *See Gilman*, 61 F. Supp. 3d at 801 n.4.

Moreover, while there may be an instance where a plaintiff is so unsophisticated and so unaware of the ramifications of assenting to a set of terms and conditions as to warrant the invalidation of a delegation clause, but that does not appear to be the case here. Beckett was a 66-year-old, lifelong professional who went back to the Bitcoin ATM on multiple occasions, assented to the Terms and Conditions three separate times to complete three separate transactions, was specifically warned via the ATM screen and text that this was likely a scam, and then misstated

that the funds were being transferred to his wallet on three different occasions when that was never the case.

Regardless, Beckett's contention that the Terms and Conditions do not contain an express delegation clause fails, so the Court will now address his unconscionability contention.

**B.** **Unconscionability**

Beckett challenges the substantive and procedural unconscionability of the Terms and Conditions. On Reply, Bitcoin argues the unconscionability of the Terms and Conditions should be decided by the arbitrator rather than the Court (Filing No. 27 at 7). Bitcoin argues that Beckett's unconscionability challenge is to the Agreement as a whole rather than solely the agreement to arbitrate and thus, pursuant to Supreme Court precedent, this issue must be determined by the arbitrator. The Court agrees.

Under Section 2 of the FAA, a party may challenge the validity of an agreement in two ways: first, he may specifically challenge the enforceability of the arbitration clause itself; and second, he may challenge the enforceability of the contract as a whole. *Buckeye*, 546 U.S. at 444; *Mooneyham*, 2025 U.S. Dist. LEXIS 35477, at *12. The former challenge is for the court to decide, whereas the latter is for the arbitrator to decide. *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70–72 (2010); *Buckeye*, 546 U.S. at 444.

Here, Beckett's challenge falls under the latter—a challenge that the entire contract is unconscionable. Beckett specifically argues that "[t]he arbitration agreement and related terms are unconscionable and unenforceable under Indiana law." (Filing No. 26 at 11). Beckett's substantive challenge argues that:

> Bitcoin Depot's Terms [and Conditions] create an unconscionable system that immunizes the company from liability while ensuring it profits from every transaction—including those it knows are fraudulent. Compl. ¶¶ 24, 81, 89–98. The agreement requires individual arbitration in Atlanta, Georgia, bars class actions,

11

>  and limits Bitcoin Depot's liability to "THE FEES PAID BY YOU TO BITCOIN DEPOT (IF ANY) DURING THE SIX (6) MONTHS IMMEDIATELY PRECEDING THE DATE OF ANY CLAIM." See Brown Decl. 6(a)–(b), Ex. E. In practical terms, this means Bitcoin Depot's maximum liability for facilitating a $7,000 scam is the $2,000 in fees it retained from that very transaction.

*Id.* at 9. Beckett goes on to challenge the fee retention clauses, the right to amend, and the artificial statute of limitations contained in the Terms and Conditions. *Id.* His substantive challenge concludes by stating, "The cumulative effect contravenes fundamental public policy by allowing a party to contract away liability." *Id.* at 10.

Beckett's procedural unconscionability challenge contends that the Terms and Conditions as a whole are presented as a "take-it-or-leave-it" proposition with no opportunity for negotiation or meaningful review, are displayed on a small ATM screen in dense legalese with critical provisions—including the arbitration clause, class action waiver, liability limitations, and non-refundable fee terms—buried within lengthy text, and fail to provide any plain-language explanation of their most consequential provisions. *Id.*

Bitcoin is correct. Beckett's unconscionability challenge concerns the Terms and Conditions as a whole, rather than the arbitration clause itself, requiring an arbitrator to determine this issue. *See Buckeye*, 546 U.S. at 444; *see also Rent-A-Center*, 561 U.S. at 70–72; *Mooneyham*, 2025 U.S. Dist. LEXIS 35477, at *12. Given the strong federal policy favoring arbitration, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. n. Randolph*, 531 U.S. 79, 91 (2000). Beckett has failed to do so. Accordingly, Bitcoin's Motion to Compel Arbitration is **granted**.

Bitcoin has also requested a stay of the action pending arbitration. The FAA requires a court to stay "any suit or proceeding" pending arbitration of "any issue referable to arbitration under an agreement in writing for such arbitration." 9 U.S.C. § 3. Specifically, Section 3 of the FAA provides

that "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration," the Court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." *Id.*; *see also Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 561 (7th Cir. 2008) ("[T]he proper course of action when a party seeks to invoke an arbitration clause is to stay the proceedings rather than to dismiss outright."). Accordingly, having determined that the three elements necessary for the Court to compel arbitration have been met, and that it is for the arbitrator to determine the arbitrability and unconscionability of the Terms and Conditions, the Court **grants** Bitcoin's request to stay this action. Having determined that the Motion to Compel should be granted, and this action stayed, the Court **denies** the alternative requests to "outright" dismiss this action.

### IV.    CONCLUSION

For the reasons discussed above, Bitcoin's Motion to Compel Arbitration and Stay or Dismiss the Action or in the Alternative to Dismiss and Strike Class Allegations ([Filing No. 21](#)) is **GRANTED in part and DENIED in part**. The Motion is **granted** in that Beckett is **ORDERED** to arbitrate his claims as provided by the Agreement, and this proceeding is **STAYED** pending the completion of arbitration.

The Motions for this Court to Dismiss and Strike Class Allegations are **denied without prejudice**, as these issues should be resolved by the arbitrator. The parties are **ORDERED** to file a joint report on the status of the arbitration proceedings by April 30, 2026.

**SO ORDERED.**

Date:    2/26/2026

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

13

Distribution:

Marc E. Dann
Dann Law Firm
mdann@dannlaw.com

Brian Daniel Flick
DannLaw
bflick@dannlaw.com

Marita Isabel Ramirez
Dann Law Firm
mramirez@dannlaw.com

Jena M. Valdetero
Greenberg Traurig LLP
jena.valdetero@gtlaw.com